1  Jinshu "John" Zhang (Bar No. 166981)
   John.Zhang@dentons.com
2  DENTONS US LLP
   601 S. Figueroa Street
3  Suite 2500
   Los Angeles, California 90017-5704
4  Tel: 213-623-9300

5  Jennifer D. Bennett (Bar No. 235196)
   Jennifer.Bennett@dentons.com
6  DENTONS US LLP
   One Market Plaza, Spear Tower, 24th Floor
7  San Francisco, California 94105
   Tel: 415-267-4000

8
   *Attorneys for Defendant*
9  AtGames Holdings, Ltd.

10                      **UNITED STATES DISTRICT COURT**

11                    **NORTHERN DISTRICT OF CALIFORNIA**

12                        **SAN FRANCISCO DIVISION**

13

14
15  BANDAI NAMCO ENTERTAINMENT
    AMERICA INC.
16
                              Plaintiff,
17
       vs.
18
    ATGAMES HOLDINGS, LTD.; and DOES 1
19  through 50,

20                              Defendants.

21

22

23

24

25

26

27

28

Case No.: **3:19-cv-05898-VC**

**DEFENDANT ATGAMES HOLDINGS, LTD.'S OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE GRANTED (Dkt No. 14)**

**Date: November 14, 2019**
**Time: 10 a.m.**
**Courtroom: 4**
**Judge: Judge Vince Chhabria**

1

## **TABLE OF CONTENTS**

2

**Page**

3   I.     INTRODUCTION..................................................................................... 1

4   II.    FACTUAL BACKGROUND.................................................................... 4

5          A.     The Parties' Pre-Existing Licensing Relationship and AtGames'
                  Efforts to Obtain a License to Ms. Pac-Man ............................ 4

6

7          B.     BNEA Gives AtGames Permission to Make Ms. Pac-Man Dongle and
                  Discuss Ms. Pac-Man with Retailers; AtGames Creates Conceptual
                  Brochures and Prototypes ......................................................... 5

8

9          C.     AtGames Acquires GCC's Interest in Ms. Pac-Man, Which BNEA
                  Had Hoped to Secure for Itself................................................. 7

10         D.     BNEA Retaliates Against AtGames............................................ 7

11         E.     The Pac-Man Products Were Lucrative for Both AtGames and BNEA.......... 8

12  III.   LEGAL STANDARD ............................................................................. 9

13  IV.    ARGUMENT ...................................................................................... 11

14         A.     Plaintiff Fails to Show a Likelihood of Success on the Merits........................ 11

15                1.     Plaintiff's Lanham Act Allegations and Related Business
                        Torts are Unlikely to Succeed.................................... 11

16

17                2.     Plaintiff's Copyright Infringement Allegations Are
                        Unlikely to Succeed.................................................. 15

18         B.     Plaintiff Fails to Show a Likelihood of Irreparable Harm Absent an
                  Injunction ............................................................................... 17

19

20         C.     The Balance of Equities Weigh Against an Injunction................................... 21

21         D.     An Injunction Would Not Serve the Public Interest ........................................ 23

    V.     CONCLUSION.................................................................................... 24

22

23

24

25

26

27

28

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

**Cases**

4

*ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012) .......................................................................................21

5

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) .........................................................................................10

6

7

*Alto Velo Racing Club v. Rouleur Sports Grp., LLC*,
   2015 WL 5462055 (N.D. Cal. Sept. 17, 2015) ..........................................................17, 21

8

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
   750 F.2d 1470 (9th Cir. 1985) .........................................................................................10

9

*ArcSoft, Inc. v. CyberLink Corp.*,
   153 F. Supp. 3d 1057 (N.D. Cal. 2015) ....................................................................17, 20

10

11

*Atari Games Corp. v. Nintendo of Am., Inc.*,
   897 F.2d 1572 (Fed. Cir. 1990) .......................................................................................10

12

*Caribbean Marine Servs. Co. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988) ...............................................................................10, 11, 17

13

14

*Coates-Freeman Associates, Inc. v. Polaroid Corp.*,
   792 F. Supp. 879 (D. Mass. 1992) ...................................................................................16

15

*Cutting Edge Solutions, LLC v. Sustainable Low Maint. Grass, LLC*,
   2014 WL 5361548 (N.D. Cal. Oct. 20, 2014) .................................................................21

16

17

*Dun & Bradstreet Inc. v. Walter*,
   1990 U.S. Dist. LEXIS 15446 (N.D. Ill. 1990) ...............................................................17

18

*Enterprise Rent-A-C ar Co. v. Advantage Rent-A-Car, Inc.*,
   330 F.3d 1333 (Fed. Cir. 2003) ..................................................................................12, 21

19

20

*ET Trading, Ltd v. ClearPlex Direct, LLC*,
   No., 15-CV-00426, 2015 WL 913911 (N.D. Cal. Mar. 2, 2015) ....................................11

21

*Evolv, LLC v. Joyetech USA, Inc.*,
   No. SACV 16-00459-CJC, 2016 WL 7507761 (C.D. Cal. 2016) ...................................21

22

23

*In re Excel Innovations, Inc.*,
   502 F.3d 1086 (9th Cir. 2007) .........................................................................................18

24

*Freedom Holdings, Inc. v. Spitzer*,
   408 F.3d 112 (2d Cir. 2005) .............................................................................................10

25

26

*Galaxy Chemical Co. v. BASF Corp.*,
   11 U.S.P.Q.2d 1279 (N.D. Ill. 1989) ...............................................................................23

27

28

OPPOSITION TO TRO AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:19-cv-05898-VC

*Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013) ......................................................................17, 18, 19, 20

*Ill. Tool Works, Inc. v. Grip-Pak*,
  906 F.2d 679 (Fed. Cir. 1990) .................................................................................22

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine
  Fisheries Serv.*,
  No. 13-cv-03717-NC, 109 F. Supp. 3d 1238, 2015 U.S. Dist. LEXIS 70622, 2015
  WL 3466314 (N.D. Cal. May 29, 2015) .................................................................17

*Knickerbocker Toy Co., Inc. v. Azrak-Hamway Int'l, Inc.*,
  668 F.2d 699 (2d Cir. 1982) .............................................................................16, 17

*Koller v. Brown*,
  224 F. Supp. 3d 871 (N.D. Cal. 2016) .....................................................................10

*Levi Strauss & Co. v. Papikian Enterprises, Inc.*,
  No, 2011 WL 5192237 (N.D. Cal. Nov. 1, 2011) ....................................................14

*Meggitt (San Juan Capistrano), Inc. v. Yongzhong*,
  No. SACV-13-0239 DOC, 2013 WL 572195 (C.D. Cal. Feb. 13, 2013).....................10

*In re Mortgage Elec. Registration Systems (MERS) Litigation*,
  No. CV-10-630-PHX-JAT, 2010 WL 11475611 (D. Ariz. Jun. 11, 2010) ...............11, 22

*Nautilus Group, Inc. v. ICON Health and Fitness, Inc.*,
  372 F.3d 1330 (Fed. Cir. 2004) ...............................................................................13

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
  638 F.3d 1137 (9th Cir. 2011) .................................................................................12

*Nutri/System, Inc. v. Con-Stan Indus., Inc.*,
  809 F.2d 601 (9th Cir. 1987) ...................................................................................13

*Official Airline Guides, Inc. v. Goss*,
  6 F.3d 1385 (9th Cir. 1993) .....................................................................................13

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) .................................................................................15

*Precision Instrument Mfg. Co. v. Auto Maint. Mach. Co.*,
  324 U.S. 806 (1945) ...........................................................................................11, 22

*Purdum v. Wolfe*,
  No. 13-cv-04816 DMR, 2014 U.S. Dist. LEXIS 5480, 2014 WL 171546 (N.D. Cal.
  Jan. 15, 2014) .........................................................................................................20

*Scotts Co. v. United Industries Corp.*,
  315 F.3d 264 (4th Cir. 2002) ...................................................................................22

*Signeo USA, LLC v. SOL Republic, Inc.*,
  No. 5:11-CV-06370-PSG, 2012 WL 2050412 (N.D. Cal June 6, 2012).....................13

- iii -

*Silvas v. G.E. Money Bank*,
    449 Fed. Appx. 641 (9th Cir. 2011) .......................................................................11, 23

*Sleash, LLC v. One Pet Planet, LLC*,
    No. 14-cv-00863, 2014 U.S. Dist. LEXIS 113520, 2014 WL 4059163 (D. Or. Aug.
    15, 2014).........................................................................................................................20

*Swisher Mower & Machine Co., Inc. v. Haban Manuf'g, Inc.*,
    931 F. Supp. 645 (W.D. Mo. 1996).................................................................................16

*Taimani v. Residential Mortgage Loan Trust 2013-TT2*,
    No. 16-cv-02992-YGR, 2016 WL 917877 (N.D. Cal. Jun. 7, 2016) ...............................10

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
    610 F.3d 1171 (9th Cir. 2010) ........................................................................................14

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*,
    No. 12-cv-03856 PJH, 2014 U.S. Dist. LEXIS 121444, 2014 WL 4312021 (N.D.
    Cal. Aug. 28, 2014) ...............................................................................18, 19, 20, 21

*Williams v. Green Valley RV, Inc.*,
    No. 15-cv-01010, 2015 U.S. Dist. LEXIS 103409, 2015 WL 4694075 (C.D. Cal.
    Aug. 6, 2015)...............................................................................................17, 18, 20

*Winter v. Natural Res. Def. Council, Inc.*,
    129 S. Ct. 365 (2008) ..............................................................................................10, 18

*XimpleWare Corp. v. Versata Software, Inc.*,
    No. 13-cv-05160-SI, 2013 U.S. Dist. LEXIS 172411, 2013 WL 6405979 (N.D. Cal.
    Dec. 6, 2013) .................................................................................................................17

**Statutes**

15 U.S.C.
    § 1114 ..............................................................................................................................12
    § 1114(1)(a) ......................................................................................................................15
    § 1116(d) ..........................................................................................................................15

17 U.S.C.
    § 107 .................................................................................................................................15

California Business and Professional Codes
    § 17200 .............................................................................................................................11
    § 17500 .............................................................................................................................11

**Rules and Regulations**

Federal Rules of Evidence
    Rule 602 ...........................................................................................................................19
    Rule 801...........................................................................................................................19

1

## I.     <u>INTRODUCTION</u>

2     This case purports to involve allegations that Defendant AtGames Holdings, Ltd. ("AtGames")

3  is infringing intellectual property ("IP") rights in the Ms. Pac-Man video game.  However, despite

4  Plaintiff Bandai Namco Entertainment America, Inc. ("BNEA")'s voluminous submissions on this

5  motion, there is evidence only of a few *de minimis* uses of IP in Ms. Pac-Man--and they do not

6  constitute infringement.  To the extent BNEA complains about AtGames merely discussing a

7  hypothetical Ms. Pac-Man product with retailers, AtGames did so with BNEA's knowledge and

8  permission while they were engaged in advanced business discussions; in any event, there is nothing

9  unlawful about discussing a potential product as long as IP rights are not infringed and the parties are

10  clear about who owns the IP rights.  That is all that happened here.  For avoidance of doubt, AtGames

11  is <u>**not**</u> marketing, advertising, distributing, promoting, offering to sell, or selling any product,

12  packaging, or any other item of any kind that uses, includes, or incorporates Ms. Pac-Man IP.   No

13  such AtGames commercial product even exists.

14     AtGames has long sought a license to Ms. Pac-Man from BNEA.  As is customary in the

15  gaming industry, while the parties were discussing a license, AtGames made <u>**three**</u> prototypes of a

16  home arcade product that included Ms. Pac-Man.  One of those prototypes was sent to the inventor

17  and royalty right holder of Ms. Pac-Man, Mr. Curran of General Computer Company ("GCC"), in the

18  hope that he would help AtGames obtain a license to Ms. Pac-Man from BNEA.  Obviously, Mr.

19  Curran was not a consumer and he understood AtGames did not own rights to Ms. Pac-Man.  Indeed,

20  acquiring such rights was the purpose of their communications.  Thus, it was impossible for Mr.

21  Curran to be confused as to the origin of the prototype, nor were any false or misleading statements

22  made to Mr. Curran about AtGames' rights to Ms. Pac-Man.  The other prototypes, made for internal

23  testing, are in AtGames' possession and not being shown or displayed to the public.

24     The only other use of Ms. Pac-Man IP for which BNEA provides any evidence are internal

25  "concept" marketing brochures that depict how AtGames might market a Ms. Pac-Man product if it

26  obtained a license, after BNEA had expressly given a written "ok" for the Ms. Pac-Man product.  The

27  conceptual brochures were designed for internal use, although they were sent confidentially to a sales

28  representative almost a year ago.  The conceptual brochures have not been displayed to the public, nor

OPPOSITION TO TRO AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:19-cv-05898-VC

are there any plans for them to be displayed to the public.  In fact, the hypothetical Ms. Pac-Man

product in the conceptual brochures was never even made--and AtGames fully understands it cannot

make or sell such a product without a license from BNEA.

Given that AtGames currently is not making any use of Ms. Pac-Man IP, it has repeatedly

expressed its willingness to render the instant motion moot by stipulating that it will not use Ms. Pac-

Man IP unless and until it obtains a license from BNEA.  Yet, in a clear effort to hurt AtGames'

reputation, BNEA rejected AtGames' offer and moved forward with this motion.

Why, if AtGames is not actually making or selling Ms. Pac-Man products, has BNEA chosen

to litigate with AtGames and bring the instant motion?  The answer is that BNEA is seeking to punish

AtGames for entering into a contract with a third-party (the above-referenced GCC) that BNEA had

hoped to secure for itself.  BNEA's counsel admitted as much when it wrote to AtGames counsel:

> AtGames has the opportunity to preserve its current relationship and license
> agreements and potential future opportunities with Bandai Namco, *so long as
> AtGames complies with Bandai Namco's request, i.e. that AtGames rescinds
> whatever offer it has proposed to GCC* relative to assignment of the agreement
> between Bandai Namco and them, and refrains from any other efforts to interfere
> with the contractual relationship between Bandai Namco and the GCC
> successors.  *If that commitment is not forthcoming by close of business today,
> i.e. by 6:00 pm Pacific today August 27, 2019, BNEA will immediately terminate
> its current license agreements with AtGames, and will permanently remove
> AtGames as a partner with which it conducts business*.  Bandai Namco hopes
> that AtGames will make the decision to correct and preserve its relationship with
> Bandai Namco.
>
> In the meantime, to help AtGames make its decision, we take this opportunity to
> reiterate that, *should AtGames acquire GCC's interest in Ms. PAC-MAN,*
> pursuant to current agreement with GCC, Bandai Namco can ensure that
> AtGames investment will be useless.  *AtGames can be promised that continued
> actions will be taken by Bandai Namco to ensure that there is zero income
> stream delivered pursuant that agreement*, as has already been contemplated and
> decided by Bandai Namco, even prior to AtGames involvement in the situation.

(August 27, 2019 E-mail from D. May to J. Zhang, attached as **Exhibit A** to Declaration

of Jinshu John Zhang in support of Defendant's Opposition ("Zhang Decl.,") (emphasis

added).

BNEA's motion papers obscure the fact that AtGames has long been a licensee of BNEA for

games such as PAC-MAN and have been in advanced and transparent business discussions for over a

year about Ms. Pac-Man.  As business partners, AtGames has generated a lot of royalty revenue for

- 2 -

BNEA (including, notably, revenue that BNEA readily accepted for the very AtGames PAC-MAN products that BNEA now disparages in its motion--but which BNEA had reviewed and approved before they were on the market).  When AtGames sought to obtain license rights from BNEA for Ms. Pac-Man, it was advised that BNEA would not grant such a license while an unidentified "third party," which AtGames later learned was GCC, owned certain rights and revenue streams.  BNEA's goal was to acquire GCC's rights cheaply, without first disclosing to GCC the millions of dollars of guaranteed advance royalties offered by companies such as AtGames, so that it (BNEA) could make more profit from the monetization of Ms. Pac-Man.  Instead, AtGames acquired GCC's rights in Ms. Pac-Man based on the hope and expectation that BNEA would grant a license to AtGames so that AtGames could make both companies a lot of money by selling Ms. Pac-Man products.  BNEA, however, was infuriated by AtGames' acquisition of GCC's rights (which it had hoped to secure for itself on the cheap through improper withholding of information from GCC about the true revenue prospects for Ms. Pac-Man), so BNEA retaliated.  Its retaliation included manufacturing reasons why AtGames was suddenly in breach of the Pac-Man licensing agreements and purporting to terminate these agreements.  BNEA's retaliation also included the filing of this suit, which deals with--at most-- trifling and *de minimis* uses of Ms. Pac-Man IP.  And, BNEA's retaliation also includes the instant motion and the negative public attention it will bring to AtGames.  BNEA's conduct in this regard constitutes unclean hands, and is itself a valid basis for denying the equitable relief that BNEA now seeks.

The Court should deny the requested preliminary injunction for several additional reasons. *First*, BNEA is unlikely to succeed on any of its claims.  BNEA's Lanham Act and related business tort allegations fail because BNEA has presented no evidence of any consumer confusion, false statements, false advertising or unfair competition.  Those claims and BNEA's copyright claims fail because AtGames' extremely limited use of Ms. Pac-Man IP on three prototypes and internal "concept" brochures constitute fair use and/or *de minimis* use.

*Second*, BNEA utterly fails to meet its burden to demonstrate irreparable harm.  Setting Plaintiff's speculation and hyperbole to the side, this case concerns three allegedly infringing prototypes and internal concept marketing brochures.  But there is no evidence those items were ever

1  displayed to the public, much less that such display is ongoing.  Moreover, one of the prototypes is in

2  Mr. Curran's, not AtGames', possession, and there is no evidence that Mr. Curran is trying to sell the

3  prototype to the public, not to mention that Mr. Curran is one of the inventors of Ms. Pac-Man and

4  knows exactly who owns the licensing right thereto.  Thus, any claim of irreparable harm is belied by

5  the fact that there is no ongoing alleged infringement, there is no evidence that any infringement has

6  had any impact on BNEA in the marketplace, and AtGames has actually offered to stipulate that it will

7  not advertise, make or sell any Ms. Pac-Man product pending a license from BNEA.

8  The great irony in this case is that AtGames has always understood, taken the position, and

9  communicated to anyone who would listen that it is not authorized to sell Ms. Pac-Man without a

10  license from BNEA.  And, AtGames has no intention of doing so.  Thus, far from preventing

11  imminent or irreparable harm, an injunction would only serve to prevent AtGames from doing things

12  it already is not doing and has offered to promise BNEA it will not do.

13  **II.**    **FACTUAL BACKGROUND**

14    **A.**    **The Parties' Pre-Existing Licensing Relationship and AtGames' Efforts to Obtain**
        **a License to Ms. Pac-Man**

15

16  AtGames has successfully entered into two lucrative licensing relationships with BNEA for

17  other BNEA video games (including Pac-Man) for use in AtGames' products, including in October

18  2016 and July 2018.  (*See* Declaration of Dr. Ping-Kang Hsiung in support of AtGames' Opposition to

19  Plaintiff's Application ("Hsiung Decl."), ¶3).

20  Throughout 2018 and 2019, AtGames was in serious and advanced business discussions with

21  BNEA regarding AtGames' development of gaming products with Ms. Pac-Man.  *Id.*, ¶6.  Throughout

22  these business discussions, as common in the industry, AtGames was transparent with BNEA as to the

23  gaming products that AtGames wanted to develop, was transparent that AtGames was talking to

24  retailers and sent to BNEA an image of a potential AtGames Ms. Pac-Man product at the retail shelf.

25  *Id.;* Exs. 1-2.  In May 2018, BNEA confirmed AtGames could release a HDMI Dongle with Ms. Pac-

26  Man.  *Id.,* Ex. 1 ("I've gotten the final confirmation from JP team on releasing SKU A for this holiday

27  and SKU B [Ms. Pac-Man] early next year.  Next Step is fixing 12 IPs for SKU A, and confirm the

28  royalty for SKU B [Ms. Pac-Man]."  And, on August 28, 2018, AtGames' Sherry Hsu sent Shoya

1  Yamazaki and Kyoko Acheson of BNEA an AtGames home arcade mock-up product sheet. *Id.,* Ex.

2  3.

3      During continued business discussions, on October 15, 2018, AtGames sent BNEA proposals

4  for Ms. Pac-Man products. *Id.*, ¶7; Ex. 4.  On October 15, 2018, AtGames received a response from

5  Mr. Yamazaki of BNEA thanking AtGames for its proposal and requesting AtGames to re-submit two

6  separate proposals, one for the HDMI Dongle and one for the Home Arcade. *Id.*, ¶9.

7      On October 16, 2018, AtGames sent BNEA, as requested, separate proposals to cover the

8  HDMI Dongle and home arcade. *Id.*, ¶10; Ex. 4.  The two proposals were sent on BNEA's template

9  form. *Id.*  The template BNEA proposal form requests potential royalty forecasts.  BNEA's

10  Merchandise License Proposal Worksheet requests information "in order for BNEA to evaluate your

11  request." *Id.*  One of the other requested categories of information in BNEA's template form is a

12  description of the proposed distribution channel(s) for the goods and specifically requests a list of

13  possible retailers.  Among others, Walmart and GameStop, were identified as possible retailers. *Id.*  It

14  was expected from BNEA that AtGames have relationships with these retailers. *Id.*, ¶7; Ex. 1

15  ("Regarding the distribution in US, I assume AtGames has direct accounts with most of main retailers

16  such as Game Stop, Walmart.")

17  **B.    BNEA Gives AtGames Permission to Make Ms. Pac-Man Dongle and Discuss Ms.
18           Pac-Man with Retailers; AtGames Creates Conceptual Brochures and Prototypes**

19      Since October 2018, AtGames understood it had BNEA's approval for its Ms. Pac-Man HDMI

20  Dongle, but that specific approval for the home arcade would take more time given a third-party issue.

21  *Id.*, ¶11; Ex. 4 ("we're ok with releasing Ms. PAC-MAN blast [the HDMI Dongle] regarding Home

22  Arcade, we need to discuss with our JP headquarter, and BANDAI NAMCO Amusement America…

23  The reason being, there would be another royalty to 3rd party for Ms. PAC-MAN, and with that, Ms.

24  PAC-MAN cannot be mixed up with our other IPs. (If we mix up Ms. PAC-MAN with other IPs, we

25  have to pay 3rd party royalties for all IPs included)."; Ex. 5 ("*[W]e are working hard to solve the*

26  *situation for MsPAC-MAN so hopefully we can come back to you before end of the year*.")

27  AtGames proceeded to discuss with retailers the potential for an AtGames Ms. Pac-Man product. *Id.*,

28  ¶8.

**OPPOSITION TO TRO AND MOTION FOR PRELIMINARY INJUNCTION**
**Case No. 3:19-cv-05898-VC**

1    AtGames has never told anyone, including at GameStop or Walmart, that AtGames has or ever

2    had a license to Ms. Pac-Man.  *Id.,* ¶8.  AtGames has only ever represented that it was trying to obtain

3    and would like to obtain a license to Ms. Pac-Man from BNEA.  *Id.*  But, in accord with industry

4    practice and BNEA's expectations, AtGames discussed the potential products with retailers.  *See*

5    Hsiung, ¶7, Ex. 1 ("Regarding the distribution in US, I assume AtGames has direct accounts with

6    most of main retailers such as Game Stop, Walmart" and "This is crazy idea, but as a compromise

7    plan, will there be any way to involve BANDAI in your product distribution? ***I assume you would***

8    ***start discussion with retailers other than Walmart,*** will there be any chances for BANDAI to be

9    distribution partner of AtGames, so BANDAI can earn some money out of your products.")

10   AtGames also mocked up concept marketing brochures which depicted how AtGames might

11   market a Ms. Pac-Man product if it obtained the license from BNEA.  Hsiung Decl., ¶12.  They were

12   shared confidentially with AtGames' sales representatives, Peake Marketing, for feedback.  *Id.*  The

13   "product concept" brochures, attached to the Peake Declaration as exhibits B (dated November 2018)

14   and D (dated January 2019), were made after AtGames obtained an "ok" from Mr. Yamazaki in

15   October 2018 for the Ms. Pac-Man Dongle.  *Id.*, ¶12; Ex. 4; Dkt Nos. 14-32; 14-34).  These "concept"

16   marketing brochures were never released to the public or shown to anyone outside the protection of a

17   confidentiality obligation.  *Id.*  The brochures, titled "Product Concepts" were for internal purposes.

18   Peake Decl., Exs. B and D.  They also state, "Product specs and images are for reference only and

19   ***upon licensor approval***, subject to change. For ***internal*** communication only."  Peake Decl., Ex. D, p.

20   5; Ex. B, p. 6 (emphasis added).  And, both state, "Images and product name is for reference only and

21   subject to change. ***The trademarks and images are the properties of their respective owners***. This

22   presentation is for AtGames ***internal communication only***."  Peake Decl., Ex. B, p. 23; Ex. D, p. 34.

23   A similar rendering was shared with BNEA and BNEA did not object to it.  *Id.* ¶13; Exs. 1-2.  The

24   conceptual Ms. Pac-Man Dongle product in the conceptual brochures was never made.  *Id.,* ¶12.

25   AtGames also made one mock-up prototype to send to Kevin Curran, one of the inventors and

26   a royalty right owner of Ms. Pac-Man, so Mr. Curran help AtGames with its pending licensing request

27   and two mock-up prototypes for AtGames' internal testing/study and to later send to BNEA for their

28   feedback and approval.  Hsiung Decl., ¶¶18-21.  These are the only prototypes AtGames has ever

1   made with Ms. Pac-Man.  *Id.,* ¶21.  These prototypes were never shown, displayed, marketed,

2   advertised, offered for sale or sold to the public.  *Id.*

3   **C.    AtGames Acquires GCC's Interest in Ms. Pac-Man, Which BNEA Had Hoped to Secure for Itself**

4

5   Through online research, AtGames learned about the development story of Ms. Pac-Man and

6   that GCC, a group of MIT students, including, Steve Golson and Kevin Curran, had developed Ms.

7   Pac-Man in the 1980s and that GCC owned certain royalty rights in Ms. Pac-Man.  Hsiung Decl., ¶14.

8   AtGames subsequently reached out to GCC to see if they could help AtGames obtain a Pac-

9   Man license and also to collaborate with GCC including, to create new games and to create education

10  STEM products to teach young children and girls how to program.  *Id.,* ¶15.  In August 2019, PK

11  Hsiung of AtGames met with Kevin Curran to discuss potential collaborations and learned that GCC

12  only had a royalty sharing right and that BNEA had offered to buy GCC's rights and BNEA did not

13  tell GCC about the pending requests to license Ms. Pac-Man from BNEA.  *Id.,* ¶¶16-17.  After the in-

14  person meetings about broader long-term collaboration between AtGames and GCC, in connection

15  with wanting Kevin Curran's support in getting a license from BNEA, AtGames made one Ms. Pac-

16  Man arcade prototype and shipped it to Kevin Curran.  *Id.*, ¶¶18-19.  AtGames and GCC also entered

17  into a licensing support agreement on August 16, 2019.  Hsiung Decl., ¶18; Ex. 6.  As set forth in the

18  support agreement, AtGames agreed to pay a 5% royalty directly to GCC so that BNEA could keep

19  AtGames' royalty payment completely for itself and would not need to share any of its royalty from

20  AtGames with GCC.  *See id.,* Ex. 6, ¶¶3-4.  AtGames was agreeing to pay "on top of" its royalty

21  payment to BNEA, a royalty payment to GCC, such that BNEA could make more money.  *Id.*

22  **D.    BNEA Retaliates Against AtGames**

23  After learning that AtGames had talked to GCC, BNEA threatened AtGames to back off from

24  contacting GCC or he would terminate AtGames' agreements for Pac-Man.  Hsiung Decl., ¶¶22-23;

25  Ex. 8, Aug. 22, 2019 email from Dr. Hsiung.  This was also communicated to AtGames' counsel.  *See*

26  Declaration of Jinshu John Zhang in support of AtGames' Opposition to BNEA's Application for a

27  Temporary Restraining Order and Order to Show Cause Why A Preliminary Injunction Should Not Be

28  Granted,  ("Zhang Decl."), Ex. A.  On August 27, 2019, BNEA sent a notice to terminate the 2016 and

2018 agreements.  Hsiung Decl., ¶24.  AtGames believes the only reason BNEA wanted to terminate the 2016 and 2018 license agreements with AtGames is because BNEA wanted to buy GCC's royalty rights for itself.  *Id*., ¶24.  Very recently, before learning of the AtGames' communications with GCC, AtGames was working with BNEA to prepare for the 40th anniversary of Pac-Man.  *See* Hsiung Decl, ¶24; Ex. 5, July 22, 2019 email from Shuhei Hokari regarding 2020 Planning ("The topic we would like to discuss would be the products plan for 2020 which is 40th anniversary of PAC-MAN.")

AtGames repeatedly agreed to stipulate to that it would not market, advertise, distribute, promote, offer to sell, or sell any product, packaging, or any other item of any kind that uses, includes, or incorporates Ms. Pac-Man.  *See e.g.,* Zhang Decl., Ex. E; Hsiung Decl., ¶4.

At no time did AtGames' counsel or anyone from AtGames threaten to launch any Ms. PAC-MAN game on October 7, 2019 or any other date before a license was obtained from BNEA.  *See* Zhang Decl., ¶¶3-7, Exs. B-D.  Instead, as evidenced by communications from BNEA's counsel Mr. May, BNEA's counsel appeared to be working with AtGames' counsel to communicate important deadlines to BNEA, to the extent the parties were to come to an agreement on a license, so that the products would be available for this holiday season.  *Id.*

**E.     The Pac-Man Products Were Lucrative for Both AtGames and BNEA**

While this litigation concerns only Ms. Pac-Man, BNEA's motion seeks to distract the Court by focusing predominantly on a different game--Pac-Man--and it disparages the Pac-Man product that AtGames sold.  In fact, as described below, BNEA was the cause of the issues with the Pac-Man box art, BNEA requested AtGames to change the box art, AtGames complied, BNEA approved the product, BNEA gladly received substantial royalty payments from AtGames in connection with the product, and never complained until it learned of AtGames' deal with GCC.

There are multiple versions of PAC-MAN games, including several for the home consoles (the "Home Version") and one for the original arcade (the "Arcade Version").  Declaration of Jodie Lee in Support of AtGames' Opposition to BNEA's Application, ("Lee Decl."), ¶4.  AtGames submitted the product packaging as well as the Home Version video to BNEA for approval in or around June of 2018, and BNEA approved the product.  *Id.,* ¶5.  BNEA provided AtGames with images for the Home Version's box art.  *See* Lee Decl., ¶¶5-6; Lee Exhibit 1.  AtGames submitted, for BNEA's approval,

the box art for the Home Version.  AtGames' submission included a screenshot of the Home Version in "landscape" format, which is representative of most consumers' experience for home console games.  *See* Lee Decl., ¶6.

During the packaging approval process, BNEA requested that AtGames change the box art for the Home Version so that it would use a screenshot of the Pac-Man Game in the "vertical" format, which is representative of most consumers' experience for the Arcade Version.  *Id*., ¶¶7-9.  BNEA explained, "The important thing is AtGames should keep saying that AtGames is referring to Arcade version,..."  *See* Lee Decl., ¶9; Lee Exhibit 3.  AtGames made the change to the box art that BNEA had requested, and it proceeded to distribute the Home Version as approved by BNEA.  *Id*., ¶9.

When the Home Version was sold to consumers, some customers identified that the home console version (*i.e*., in landscape) game did not match the arcade (*i.e.* in portrait "horizontal") screenshot that AtGames had added to the box art at BNEA's request.  *See* Lee Decl., ¶10.  This mismatch between the box art and the home console version is the source of the so-called problems with the PAC-MAN product.  *Id.,* ¶10.  There is no distinction of "inferior" and "superior" between the Home Version and the Arcade Version.  *Id.,* ¶11.  Gamers who mostly played the Home Version while growing up may feel more nostalgic about the Home Version, whereas others who mostly played the Arcade Version while growing up may naturally tend to prefer the Arcade Version.  *Id.*

Notwithstanding this box art issue that was attributable to BNEA and subsequently addressed by AtGames, BNEA at all times continued to collect royalties on AtGames' sale of the Home Version. *Id.,* ¶12.  After realizing the above-referenced issue regarding the Home Version in October 2018, BNEA never claimed that this problem was a justification for it to terminate the parties' license agreements regarding PAC-MAN until around August of 2019, when it learned that AtGames was in discussions to acquire GCC's interest in Ms. Pac-Man.  *Id.* ¶¶13-16; Hsiung Decl., ¶24.

## III.   LEGAL STANDARD

"A preliminary injunction is an 'extraordinary and drastic remedy' that is never awarded as of right."  *Taimani v. Residential Mortgage Loan Trust 2013-TT2*, No. 16-cv-02992-YGR, 2016 WL 917877, *1 (N.D. Cal. Jun. 7, 2016).  When seeking a preliminary injunction, a plaintiff bears the burden to establish four factors, namely that: (1) he is likely to succeed on the merits; (2) he is likely

1    to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his

2    favor; and (4) an injunction is in the public interest.  *Taimani*, 2016 WL 917877, *1, *citing Winter v.*

3    *Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008).

4         "In the Ninth Circuit, the *Winter* factors may be evaluated on a sliding scale: 'serious questions

5    going to the merits, and a balance of the hardships that tips sharply toward the plaintiff can support the

6    issuance of a preliminary injunction, so long as the plaintiff also shows there is a likelihood of the

7    irreparable injury and that the injunction is in the public interest.'"  *Meggitt (San Juan Capistrano),*

8    *Inc. v. Yongzhong*, No. SACV-13-0239 DOC, 2013 WL 572195, *1 (C.D. Cal. Feb. 13, 2013), *citing*

9    *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

10        The decision to grant or deny a preliminary injunction is in the sound discretion of the district

11   court.  *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1575 (Fed. Cir. 1990).  However,

12   "a district court should be wary of issuing an injunction based solely upon allegations and conclusory

13   affidavits submitted by plaintiff."  *Taimani*, 2016 WL 917877, *1, q*uoting Atari Games Corp. v.*

14   *Nintendo of Am., Inc.*, 897 F.2d 1572, 1575 (Fed. Cir. 1990), *citing Am. Passage Media Corp. v. Cass*

15   *Commc'ns, Inc.*, 750 F.2d 1470, 1471 (9th Cir. 1985).

16        "An adequate showing of irreparable harm is the 'single most important prerequisite for the

17   issuance of a [TRO]."  *Koller v. Brown*, 224 F. Supp. 3d 871, 879 (N.D. Cal. 2016), *citing Freedom*

18   *Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005).  "Speculative injury does not constitute

19   irreparable injury sufficient to warrant granting a preliminary injunction."  *Koller v. Brown*, 224 F.

20   Supp. 3d at 879, *citing Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  A

21   plaintiff must do more than merely allege imminent harm sufficient to establish standing; rather, a

22   plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive

23   relief.  *Caribbean Marine*, 844 F.2d at 674.  "Subjective apprehensions and unsupported predictions

24   … are not sufficient to satisfy a plaintiff's burden of demonstrating an immediate threat of irreparable

25   harm."  *Caribbean Marine,* 844 F.2d at 675-76.

26        While a threatened loss of customers or goodwill can, in some instances, constitute irreparable

27   harm, "Plaintiff bears the burden of putting forth sufficient evidence to establish a likelihood of

28   irreparable harm absent a temporary restraining order.  In the instant case, that would require Plaintiff

1  to clearly show that absent injunctive relief, Plaintiff would likely suffer the loss of prospective
2  customers or goodwill." *ET Trading, Ltd v. ClearPlex Direct, LLC*, No., 15-CV-00426, 2015 WL
3  913911, *3 (N.D. Cal. Mar. 2, 2015).
4       When a party requests equitable relief—like the preliminary injunction sought here—they
5  must not have unclean hands.  In the words of the old axiom: "he who seeks equity must do equity."
6  *In re Mortgage Elec. Registration Systems (MERS) Litigation*, No. CV-10-630-PHX-JAT, 2010 WL
7  11475611, *3 (D. Ariz. Jun. 11, 2010); *see also Precision Instrument Mfg. Co. v. Auto Maint. Mach.*
8  *Co.*, 324 U.S. 806, 815 (1945) ("Any willful act [which] transgress[es] equitable standards of conduct
9  is sufficient cause" to deny and injunction); *Silvas v. G.E. Money Bank*, 449 Fed. Appx. 641, 644 (9th
10  Cir. 2011) (affirming denial of preliminary injunction based on doctrine of unclean hands).
11  **IV.   ARGUMENT**
12       **A.   Plaintiff Fails to Show a Likelihood of Success on the Merits**
13            **1.   Plaintiff's Lanham Act Allegations and Related Business Torts are
14                 Unlikely to Succeed**
15       When seeking a preliminary injunction, Plaintiff must prove that it is likely to succeed on the
16  merits.  Given the facts here, Plaintiff has not shown it is likely to succeed on its Lanham Act and
17  related California business tort and statutory claims.  Specifically, Plaintiff asserts trademark
18  infringement (count 1), counterfeiting (count 2), unfair competition and false designation of origin
19  (count 4), and false advertising (count 5) all under the Lanham Act, and unfair competition (count 6)
20  and false advertising (count 7) under California Business and Professional Codes 17200 and 17500,
21  respectively.  Plaintiffs have not shown a likelihood of success on the merits on any of these counts.
22       To prevail on a trademark infringement claim, plaintiff must establish that (1) it has a
23  protectable ownership interest in a mark and (2) defendant's use of the mark is likely to cause
24  consumer confusion.  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.,* 638 F.3d 1137, 1144
25  (9th Cir. 2011) (reversing grant of preliminary injunction).  The *sine qua non* of a trademark
26  infringement claim under the Lanham Act is whether the defendant has made unauthorized use of a
27
28

1   trademark in a manner likely to cause "consumer confusion."[1]  *See Enterprise Rent-A-Car Co. v.*

2   *Advantage Rent-A-Car, Inc.*, 330 F.3d 1333, 1338 (Fed. Cir. 2003) ("Thus, trademark law, both in the

3   infringement and registration context, traditionally has been concerned with protecting consumers

4   from being misled by the use of confusingly similar marks on goods originating from different

5   producers, and with protecting a trademark owner's good will against the sale of another's product as

6   his.")  For example, Section 32(1) of the Lanham Act provides in relevant part:

7         Any person who shall, without the consent of the registrant-

8               (a) use in commerce any reproduction, counterfeit, copy, or colorable
               imitation of a registered mark in connection with the sale, offering for
9               sale, distribution, or advertising of any goods or services on or in
               connection with which such use is ***likely to cause confusion, or to cause***
10              ***mistake, or to deceive***; or
              (b) reproduce, counterfeit, copy, or colorably imitate a registered mark
11              and apply such reproduction, counterfeit, copy, or colorable imitation to
               labels, signs, prints, packages, wrappers, receptacles or advertisements
12              intended to be used in commerce upon or in connection with the sale,
               offering for sale, distribution, or advertising of goods or services on or
13              in connection with which such use is ***likely to cause confusion, or to***
               ***cause mistake, or to deceive***,
14
15              shall be liable in a civil action by the registrant for the remedies hereinafter
               provided.
16

17  15 U.S.C. § 1114 (emphasis added).

18         Applying this standard, each of Plaintiff's Lanham Act claims must fail because it is

19  impossible that AtGames' use of the trademarks could have caused confusion, mistake or deception.

20  Indeed, fatal to BNEA's motion, BNEA has offered ***no*** evidence of likely or actual confusion.  Mot.,

21  p. 7.  This is because BNEA knows there has been no confusion, nor could there be.  The one (1)

22  person to whom AtGames sent the prototype was Mr. Curran.  Hsiung Decl., ¶¶18-19.  But, he had

23

24  [1] To demonstrate likely confusion, a plaintiff must show that the following "Sleekcraft" factors weigh
    decidedly in its favor: "(1) strength of the mark; (2) proximity of the goods; (3) similarity of the
25  marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree
    of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8)
26  likelihood of expansion of the product lines." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th
    Cir. 1979).  As discussed herein, it was impossible that the prototypes and brochures led to confusion
27  because they were not disclosed to the public.  This dooms Plaintiff's likelihood of success.  Thus,
    AtGames need not respond to BNEA's analysis of the other factors in its Opposition.
28

OPPOSITION TO TRO AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:19-cv-05898-VC

intimate knowledge of which parties owned the rights to Ms. Pac-Man, as he had long been involved in the creation and monetization of those rights.  *Id.*  And, the context of the alleged disclosure to Mr. Curran--*i.e.,* AtGames seeking to acquire his portion of the rights to Ms. Pac-Man in the hope that BNEA might be persuaded to grant AtGames a license to Ms. Pac-Man--confirms that it was impossible for him to be confused about who held Ms. Pac-Man's trademark rights.  In any event, Mr. Curran was not a prospective purchaser of the AtGames prototype.  "[T]he key inquiry is confusion of prospective purchasers."  *Signeo USA, LLC v. SOL Republic, Inc*., No. 5:11-CV-06370-PSG, 2012 WL 2050412, *7 (N.D. Cal June 6, 2012) (rejecting evidence of "repeated instances involving industry players and retail associates who have demonstrated confusion").  Not surprisingly, there is no evidence of any confusion of prospective purchasers.

Similarly, the sales representatives at Peake Marketing who, under confidentiality obligations, received the "concept" marketing brochures for feedback would not be confused about who held the Ms. Pac-Man rights, or the source/origin of a hypothetical Ms. Pac-Man product.  Hsiung Decl., ⁋12.  Indeed, the "concept" brochures themselves expressly state "product concept," "upon licensor approval" and "internal communications."  Peake Decl., Dkt No. 14-34 (Ex. D, pp. 1, 5, 34); Dkt No. 14-32 (Ex. B. pp. 1, 6, 23).  And Peake Marketing, like Mr. Curran, was not a prospective purchaser or customer, but tantamount to "internal" people, who worked with AtGames.  Again, the brochure itself states "[f]or internal communication only."  *Id.*  And, a similar mock-up had been sent to BNEA who given the advanced nature of their business discussions, not surprisingly, did not state such rendering was improper or unauthorized.  *See e.g.,* Hsiung Decl., ⁋13; Exs. 1-2.

Additionally, even if Mr. Curran or Peake Marketing were confused (they were not), such *de minimis* confusion is not sufficient to establish likely confusion within the meaning of the Lanham Act.  *See Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993) (evidence of seven misdirected mailings out of 80,000 total mailings *de minimis* and not persuasive of likely confusion); *Nutri/System, Inc. v. Con-Stan Indus., Inc*., 809 F.2d 601, 606 (9th Cir. 1987) (given parties' high volume of business, evidence of several instances of misdirected letters and checks "at best, were thin, and at worst were trivial"); *Nautilus Group, Inc. v. ICON Health and Fitness, Inc.*, 372 F.3d 1330, 1338 (Fed. Cir. 2004) (four misdirected phone calls out of thousands "relatively small number …too

1    unreliable to establish actual confusion.").

2         Finally, to the extent the trademark claim is based on AtGames' use of the term "Ms. Pac-

3    Man" in private business discussions, it must fail because a defendant's use of a trademarked name to

4    refer to the product itself is classic example of nominative fair use.  Put simply, trademark law does

5    not prevent a person from calling a product by its trademarked name.  As the Ninth Circuit has

6    explained:

7              [W]e've held that the *Sleekcraft* factors [i.e., the factors applicable to
                 determining consumer confusion in a trademark infringement analysis]
8              doesn't apply where a defendant uses the mark to refer to the
                 trademarked good itself.  *See Playboy Enters., Inc. v. Welles,* 279 F.3d
9              796, 801 (9th Cir. 2002); *New Kids on the Block v. News Am. Publ'g,
                 Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).  The [defendants] are using the
10             term Lexus to describe their business of brokering Lexus automobiles;
                 when they say Lexus, they mean Lexus.  We've long held that such use
11             of the trademark is fair use, namely nominative fair use.  And fair use is,
                 by definition, not infringement."
12

13   *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175 (9th Cir. 2010).  "[A] defendant may

14   avail himself of the nominative fair use doctrine if 'the use of the trademark does not attempt to

15   capitalize on consumer confusion or to appropriate the cachet of one product for a different one.'"

16   *Levi Strauss & Co. v. Papikian Enterprises, Inc.*, No. 2011 WL 5192237, *3 (N.D. Cal. Nov. 1, 2011),

17   quoting *New Kids*, 971 F.2d at 307-308.  When analyzing nominative fair use issues, a court is to

18   consider whether "(1) the product was 'readily identifiable' without the use of the mark; (2) defendant

19   used more of the mark than necessary; or (3) defendant falsely suggested he was sponsored or

20   endorsed by the trademark holder."  *Id.*  Here, these factors compel a finding of nominative fair use.

21        *First*, there is no way to readily and accurately identify the Ms. Pac-Man video game without

22   using the term "Ms. Pac-Man."  *Second*, to the extent Defendant was discussing Ms. Pac-Man with

23   anyone, it was accurately referring to the game by its name--which can hardly be considered excessive

24   use.  *Third*, and finally, Defendant never depicted itself as sponsored or endorsed by BNEA; to the

25   contrary, Defendant has always understood and communicated that it cannot enter into any business

26   deals for Ms. Pac-Man unless and until it receives a license from BNEA.  Hsiung Decl., ¶¶5, 8.

27        Even assuming, arguendo, nominative fair use did not apply, AtGames' use of the Ms. Pac-

28   Man trademarks would be fair use because it was *de mininimis* in nature.  This principle is discussed

- 14 -

OPPOSITION TO TRO AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:19-cv-05898-VC

1   in further detail in the section below relating to copyright fair use.

2   Finally, with respect to BNEA's Lanham Act counterfeiting claim, there is **no** evidence of any

3   commercial "sale, offering for sale, or distribution of goods or services" pursuant to 15 U.S.C. §

4   1114(1)(a) and § 1116(d)), thus, BNEA is unlikely to succeed on the merits of any counterfeiting

5   claim.  Because each of Plaintiff's Lanham act and related California business torts allegations are

6   based on the overlapping "evidence" and arguments (*see* Mot. at 6, fn 4), Plaintiff is unlikely to

7   succeed with respect to counts 1-2, and 4-7.

8           **2.**      **Plaintiff's Copyright Infringement Allegations Are Unlikely to Succeed**

9   While in advanced business discussions with BNEA, AtGames has only ever made **<u>three</u>**

10  prototypes of a concept Ms. Pac-Man home arcade and "product concept" marketing brochures for the

11  Dongle for internal purposes.  Hsiung Decl., ⁋⁋12, 21.  AtGames has never shown or displayed any

12  prototype or the "concept" marketing brochures to the public.  *Id.*  Indeed, the "concept" marketing

13  brochures were provided to Peake Marketing, AtGames' sales representatives, under confidentiality

14  obligations, to seek feedback.  *Id.*, ⁋12.  Plaintiff has alleged (Count 3), however, that AtGames has

15  infringed various of Plaintiff's purported copyrights relating to Ms. Pac-Man.

16  AtGames' *de minimis* use is permitted under the fair use doctrine.  "The fair use defense

17  permits the use of copyrighted works without the copyright owner's consent under certain situations."

18  *Perfect 10, Inc. v. Amazon,com, Inc.*, 508 F.3d 1146, 1163 (9th Cir. 2007).  The fair use defense is

19  codified in 17 U.S.C. § 107 as follows:

20
21   Notwithstanding the provisions of sections 106 and 106A, the fair use of a
     copyrighted work, including such use by reproduction in copies or
     phonorecords or by any other means specified by that section, for purposes such
22   as criticism, comment, news reporting, teaching (including multiple copies for
     classroom use), scholarship, or research, is not an infringement of copyright. In
23   determining whether the use made of a work in any particular case is a fair use
     the factors to be considered shall include—

24       (1) the purpose and character of the use, including whether such use is of a
     commercial nature or is for nonprofit educational purposes;
25   (2) the nature of the copyrighted work;
     (3) the amount and substantiality of the portion used in relation to the
26   copyrighted work as a whole; and
     (4) the effect of the use upon the potential market for or value of the
27   copyrighted work.

28   The fact that a work is unpublished shall not itself bar a finding of fair use if

- 15 -

**OPPOSITION TO TRO AND MOTION FOR PRELIMINARY INJUNCTION**
**Case No. 3:19-cv-05898-VC**

1    such finding is made upon consideration of all the above factors.

2         Here, AtGames' minimal use of the purported copyrighted work qualifies as fair use for at

3    least two reasons: (1) the purpose and character of the use was extremely limited--*i.e.,* it was part of a

4    prototype or concept that was not publicly offered or sold, and it was shown to a very limited number

5    of people [Factor 1], and (2) the use had no impact on the potential market or value of the copyrighted

6    work, as no one in the market was even aware of the use [Factor 4].  Put differently, AtGames'

7    negligible use of the Ms. PAC-MAN copyright in the context of a prototype and "concept" marketing

8    brochures that were not shown to the public, and were only shown to an extremely limited number of

9    people, is fair use.

10        AtGames' position is amply supported by the case law.  For example, in *Coates-Freeman*

11   *Associates, Inc. v. Polaroid Corp.*, 792 F. Supp. 879 (D. Mass. 1992), the defendant incorporated two

12   copyrighted works into prototypes.  *Id.* at 887.  The prototypes in *Coates-Freeman,* as the prototypes

13   and brochure here, were not disseminated outside of Polaroid, therefore the court found "there [was]

14   no evidence that would support either a finding or conclusion that any limited infringement that may

15   have taken place had any effect on the market for or value of the [copyrighted work]."  *Id.*  Indeed, the

16   Court found that Polaroid's use "did not even deprive [plaintiff] of a sale."  *Id.*  Thus, "the taking was

17   so limited in scope and nature that [plaintiff] cannot reasonably complain."  *Id.*

18        Similarly, in *Swisher Mower & Machine Co., Inc. v. Haban Manuf'g, Inc.*, 931 F. Supp. 645,

19   648 (W.D. Mo. 1996), a trade dress case, the court found "only one Haban Prototype Mower was ever

20   manufactured and it was never sold," therefore "the general maxim *de minimis non curat lex*--that is,

21   the law does not care for trifling matters--is applicable to Swisher's infringement claim with regard to

22   the prototype."  *Id.* at 648.  Therefore, the court determined that the prototype mower "will not be

23   considered."  *Id.*

24        The Court of Appeals for the Second Circuit reached a similar conclusion in *Knickerbocker*

25   *Toy Co., Inc. v. Azrak-Hamway Int'l, Inc.*, 668 F.2d 699 (2d Cir. 1982).  *Knickerbocker* involved a

26   copyright claim the defendant had used a copyrighted photograph in connection with its packaging

27   (i.e., a "blister" card), but because there was no evidence that packaging was used in the market "the

28   copyright claim with respect to the blister card falls squarely within the principle of *de minimis no*

1    *curat lex*, and dismissal of that claim is affirmed." *Id.* at 703.

2         Because the three prototypes and "product concept" brochures were never released or

3    displayed to the public, AtGames' use was *de minimis*.

4         **B.**    **Plaintiff Fails to Show a Likelihood of Irreparable Harm Absent an Injunction**

5         BNEA is not entitled to a preliminary injunction because it has not shown that it is likely to

6    suffer irreparable harm as a result of AtGames' alleged use of Ms. Pac-Man IP.  *See ArcSoft, Inc. v.*

7    *CyberLink Corp.,* 153 F. Supp. 3d 1057, 1070-1071 (N.D. Cal. 2015) (denying preliminary injunction)

8    *citing Williams v. Green Valley RV, Inc.*, No. 15-cv-01010, 2015 U.S. Dist. LEXIS 103409, 2015 WL

9    4694075, at *2 (C.D. Cal. Aug. 6, 2015) (denying motion for preliminary injunction based only on

10   movant's failure to establish a likelihood of irreparable harm); *Klamath-Siskiyou Wildlands Ctr. v.*

11   *Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, No. 13-cv-03717-NC, 109 F.

12   Supp. 3d 1238, 2015 U.S. Dist. LEXIS 70622, 2015 WL 3466314, at *8-9 (N.D. Cal. May 29, 2015)

13   (same); *XimpleWare Corp. v. Versata Software, Inc.*, No. 13-cv-05160-SI, 2013 U.S. Dist. LEXIS

14   172411, 2013 WL 6405979, at *3 (N.D. Cal. Dec. 6, 2013) (same, with respect to application for

15   temporary restraining order).  AtGames is not advertising, making, selling, or offering to sell any

16   products that include Ms. Pac-Man and has never sold a product.  Hsiung Decl., ¶4.  Thus, contrary to

17   BNEA's allegations (Mot. at p. 12) there can be no immediate threat of irreparable harm.  *See*

18   *Caribbean Marine*, 844 F.2d at 674 (The threat of irreparable harm must be "immediate" to warrant

19   preliminary injunctive relief); *Dun & Bradstreet Inc. v. Walter*, 1990 U.S. Dist. LEXIS 15446, at *12

20   (N.D. Ill. 1990) (finding no irreparable harm where innocent infringer stopped infringing conduct).

21   AtGames does not intend, and never intended, to make any commercial product without a license from

22   BNEA.  Hsiung Decl., ¶5.

23        Because harm cannot be presumed, BNEA must show actual evidence of the likelihood of

24   irreparable harm.  In its Motion, BNEA has failed to do so.  The Ninth Circuit requires actual evidence

25   of likelihood of irreparable harm along with proof that "legal remedies, such as monetary damages,

26   are inadequate."  *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th

27   Cir. 2013) (reversing preliminary injunction in trademark infringement case); *Alto Velo Racing Club*

28   *v. Rouleur Sports Grp., LLC*, No. 5:15-cv-02144-PSG, 2015 WL 5462055, *7 (N.D. Cal. Sept. 17,

**OPPOSITION TO TRO AND MOTION FOR PRELIMINARY INJUNCTION**
**Case No. 3:19-cv-05898-VC**

2015) (denying preliminary injunction; noting that "Defendants' unjust benefitting from unearned goodwill and AVRC's loss of sponsorship and members are redressable by money damages."). Indeed, "[a] party seeking a preliminary injunction must produce evidence that "irreparable injury is likely in the absence of an injunction.'" *Williams,* 2015 WL 4694075, at *2 (denying preliminary injunction).

BNEA has not shown that irreparable harm is "likely."  Under *Winter*, BNEA must establish that irreparable harm is likely, not just "possible".  The Supreme Court made clear in *Winter*, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." 555 U.S. at 22.  Thus, "[s]peculative injury cannot be the basis for a finding of irreparable harm." *Solidus Networks, Inc. v. Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007).

For example, in *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013), the Ninth Circuit held that these basic principles of irreparable harm apply with equal force in the trademark infringement context.  The Ninth Circuit, reversing the district court, found the district court had "abused its discretion by relying on unsupported and conclusory statements regarding harm [the plaintiff] *might* suffer." *Id.* at 1249-50 (emphasis in original).

BNEA's showing of alleged irreparable harm vis-à-vis Ms. Pac-Man consists of: (1) its conclusory argument that "BNEA has already suffered significant reputational harm," and (2) its misleading reference to supposed product issues concerning the **unrelated** mark and IP for Pac-Man. Mot. at 11; *see* Declaration of Jodie Lee in support of Defendant's Opposition ("Lee Decl."), ¶¶3-11. Indeed, there is absolutely no evidence in the record concerning irreparable harm to the Ms. Pac-Man IP at issue in this Motion.  Besides being irrelevant to this Motion, the cited Pac-Man-related "evidence" is not indicative of any damage to BNEA's reputation, and if there was any damage or issue with the Pac-Man Products, it is of BNEA's own making. *See* Lee Decl., ¶¶4-11.  Thus, there has been no evidentiary proof of irreparable harm. *See Wells Fargo*, 2014 U.S. Dist. LEXIS 121444, 2014 WL 4312021, at *11-13 (finding no irreparable harm where, "while [plaintiff] has shown that it has lost business, it has not shown any connection between that lost business and defendants' use of

1    the [allegedly infringing mark]").

2         In an effort to manufacture an irreparable harm argument, BNEA cites to the Lundell

3    Declaration.  Mot. at p. 12.  Despite knowing AtGames has not sold any unlicensed product, BNEA

4    argues hypothetically that "entry into the market of an unlicensed product using Ms. PAC.-MAN

5    Property,…, creates an unbearable risk to BNEA's goodwill and reputation in the industry."  Mot. at

6    12.  But, the mere prospect of the loss of reputation is not sufficient to establish a likelihood of

7    irreparable harm.  *Wells Fargo*, 2014 WL 4312021, at *9 ("Applying the holding of *Herb Reed* to the

8    present case, the court finds that Wells Fargo's arguments regarding harm to reputation and goodwill

9    are the same type of 'unsupported and conclusory statements regarding harm [plaintiff] might suffer'

10   that were rejected in *Herb Reed*.").  And, BNEA's (and Lundell's) evidence of alleged past harm

11   based on different marks and products (Pac-Man) is inadmissible, irrelevant and definitely not

12   sufficient to show damage to BNEA's reputation based on use of Ms. Pac-Man.[2]  In any event, the

13   Pac-Man products were very successful and lucrative for both AtGames and BNEA.  *See* Hsiung

14   _____

15   [2] AtGames objects the portions of the Lundell Declaration (*i.e.*, paragraphs 10-19 and exhibits C-I)
     and the Pshihoules Declaration (the entirety) thereof insofar as they refer to and attach various internet
16   postings.  Such evidence constitutes hearsay under Rule 801 of the Federal Rules of Evidence because
     the postings, and the declarants' supposed summaries thereof, are out of court statements offered for
17   the truth of the matter asserted therein.  Specifically, these posting purport to be evidence that
     AtGames' Pac-Man product is poorly made and/or has a bad reputation, and BNEA offers them for
18   that purpose.

19       AtGames further objects to the portion of the Lundell Declaration (*i.e.* paragraphs 22 and
     23and exhibits K and L), the Irie Declaration (i.e., paragraph 3 and Exhibit A), and the Windham
20   Declaration (i.e., paragraphs 4, 18 and Exhibit A) the purport to recount AtGames' conversations with
     retailers such as Gamestop.  The declarants were not parties to those conversations, therefore they lack
21   personal knowledge (Fed. R. Evid. 602), and to the extent they are relying on emails from non-
     declarants that describe other statements supposedly made by AtGames outside of court they are
22   multiple layers of hearsay under Rule 801.

23       AtGames further objects Paragraph 2 of the Hokari Declaration, as it purports to recount
     statements by an unidentified "counterpart at a BNEA affiliate" to the effect that an unidentified
24   "employee of one of the affiliates licensees" had been told by an unidentified "employee of AtGames
     Holdings Ltd., or one of its affiliates" that AtGames was acquiring rights to Ms. Pac-Man.  This
25   evidence contains multiple layers of hearsay and is outside of Mr. Hokari's personal knowledge.

26       AtGames further objects to the portion of the Lundell Declaration  (*i.e.* paragraphs 21 and 24)
     in which he offers opinion evidence that AtGames' alleged use of the Ms. Pac-Man IP is "confusingly
27   similar to" BNEA's IP, as Mr. Lundell does not purport to be an expert and he has not identified any
     methodology (much less one that complies with applicable legal standards) by which he reached his
28   opinion.

**OPPOSITION TO TRO AND MOTION FOR PRELIMINARY INJUNCTION**
**Case No. 3:19-cv-05898-VC**

1    Decl., ¶3; Lee Decl., ¶12.

2         As the Ninth Circuit recognized in *Herb Reed* "[e]vidence of loss of control over business

3    reputation and damage to goodwill could constitute irreparable harm" but such harm must be

4    established by specifically relevant evidence, not by "platitudes" or evidence that merely "underscores

5    customer confusion."  736 F.3d 1239 at 1250.  BNEA provides misleading allegations from Lundell

6    over its alleged damage to its reputation.  *See* Lee Decl., ¶¶4-11.  Since *Herb Reed*, courts in this

7    circuit have repeatedly rejected claims of irreparable harm in trademark infringement actions when

8    supported only by the sort of conclusory assertions found insufficient by the Ninth Circuit. *See, e.g.,*

9    *ArcSoft,* 153 F. Supp. 3d at 1071-72 *citing Williams*, 2015 U.S. Dist. LEXIS 103409, 2015 WL

10   4694075, at *2 ("Plaintiff relies on only consumer confusion evidence and wants the Court to believe

11   that he *might* suffer damage to his reputation or goodwill.") (emphasis in original); *Wells Fargo & Co.*

12   *v. ABD Ins. & Fin. Servs., Inc.*, No. 12-cv-03856 PJH, 2014 U.S. Dist. LEXIS 121444, 2014 WL

13   4312021, at *10 (N.D. Cal. Aug. 28, 2014) ("A plaintiff in a trademark infringement case cannot

14   obtain an injunction simply by showing a likelihood of success on the merits of its claim, and then

15   asserting (without evidence) that the alleged infringement 'devalues' and 'taints' the mark. If the court

16   were to find irreparable harm based on those conclusory assertions, it would collapse the likelihood of

17   success and the irreparable harm factors, and would have the practical effect of reinserting the

18   presumption of irreparable harm that was rejected in *Herb Reed*.") (internal quotation marks and

19   alterations omitted); *Sleash, LLC v. One Pet Planet, LLC*, No. 14-cv-00863, 2014 U.S. Dist. LEXIS

20   113520, 2014 WL 4059163, at *7 (D. Or. Aug. 15, 2014) ("Rather than providing any such evidence,

21   [plaintiff] argues that such irreparable harm automatically flows from the loss of control of its

22   business and trademark. This argument, however, is inconsistent with *Herb Reed*, as the Court cannot

23   rely on conclusory assertions unsupported by evidence."); *Purdum v. Wolfe*, No. 13-cv-04816 DMR,

24   2014 U.S. Dist. LEXIS 5480, 2014 WL 171546, at *9 (N.D. Cal. Jan. 15, 2014) ("While evidence of

25   loss of control over business reputation and damage to goodwill *could* constitute irreparable harm, a

26   plaintiff must establish such likelihood *with evidence*.") (internal quotation marks and alterations

27   omitted; emphasis in original).

28        Finally, any hypothetical harm to BNEA can readily be addressed by monetary damages.

1   BNEA has a long history of licensing its games and their related rights for a stream of royalty

2   payments (in fact, it has done so with AtGames with respect to Pac-Man).  Hsiung Decl., ¶3; Lee

3   Decl., ¶12.  To put an even finer point on it, BNEA has a long history of receiving royalties with

4   respect to Ms. Pac-Man--a factor that, while not alone dispositive, weighs against granting an

5   injunction.  *See ActiveVideo Networks, Inc. v. Verizon Communications, Inc*., 694 F.3d 1312, 1339-

6   1340 (Fed. Cir. 2012) (vacating injunction; "In light of the record evidence including [plaintiff's] past

7   licensing of this technology and its pursuit of [defendant] as a licensee, no fact finder could reasonably

8   conclude that [plaintiff] would be irreparably harmed by the payment of a royalty (a licensing fee).")

9   In the unlikely event AtGames' prototypes (*i.e.,* the only existing, allegedly infringing products) are

10  somehow monetized, AtGames can and would pay a royalty to BNEA.  And while there is no

11  evidence AtGames is selling or making any other Ms. Pac-Man products in the absence of a license

12  from BNEA--and the evidence shows that it is not doing so--AtGames would expect to pay a royalty

13  to BNEA.  Thus, there is no reason any hypothetical harm to BNEA could not be redressed through

14  monetary damages rather than equitable relief.  *See Evolv, LLC v. Joyetech USA, Inc*., No. SACV 16-

15  00459-CJC, 2016 WL 7507761, *7 (C.D. Cal. May 3, 2016) (denying motion for preliminary

16  injunction due to lack of irreparable harm; finding that plaintiff failed to "persuasively assert that

17  injunctive relief--rather than the availability of a future monetary award--is necessary to prevent

18  irreparable harm when all it collects from its patents on a regular basis is a monetary royalty"); *see*

19  *Rent-A-Ctr*, 944 F.2d at 603; *see also Wells Fargo*, 2014 U.S. Dist. LEXIS 121444, 2014 WL

20  4312021, at *13 ("[E]ven if [plaintiff] were able to attribute any lost business to defendants' alleged

21  trademark infringement, false affiliation, and/or false advertising, [plaintiff] has not shown that such

22  harm could not be remedied through monetary damages.").

23              **C.      The Balance of Equities Weigh Against an Injunction**

24              "[U]se alone does not cause the equities to favor [plaintiff]; were it so, then every trademark

25  plaintiff would receive injunctive relief."  *Alto Velo*, 2015 WL 5462055, at *7.  Rather, "[i]n

26  evaluating the balance of hardships a court must consider the impact granting or denying a motion for

27  a preliminary injunction will have on the respective enterprises."  *Cutting Edge Solutions, LLC v.*

28  *Sustainable Low Maint. Grass, LLC,* 2014 WL 5361548, at *13 (N.D. Cal. Oct. 20, 2014) (citations

- 21 -

1   omitted).  BNEA has made serious, but unfounded, allegations against AtGames.  AtGames is not

2   advertising, making, selling, or offering for sale any products containing Ms. Pac-Man.  Hsiung Decl.,

3   ¶4.  This has repeatedly been told to BNEA counsel.  *Id.,* Zhang Decl., Ex. E.  And, AtGames has

4   confirmed it will not advertise, make, sell or offer for sell any products containing Ms. Pac-Man

5   without a license to do so.  Hsiung Decl., ¶5; Zhang Decl., Ex. E.  Thus, there is no activity to enjoin

6   and a preliminary injunction would serve no purpose.

7          Instead, a preliminary injunction would damage AtGames' reputation and goodwill, causing

8   AtGames irreparable harm.  Before a preliminary injunction may issue, the court must identify the

9   harm that a preliminary injunction might cause the defendant and weigh it against plaintiff's

10  threatened injury.  "[T]he real issue in this regard is the degree of harm that will be suffered by the

11  plaintiff or the defendant if the injunction is improperly granted or denied."  *Scotts Co. v. United*

12  *Industries Corp*., 315 F3d 264, 284 (4th Cir. 2002).  Because AtGames would face irreparable harm if

13  the Court grants BNEA's motion for a preliminary injunction, the Court should minimize the harm

14  against AtGames in this case by denying a preliminary injunction.  *See Ill. Tool Works, Inc. v. Grip-*

15  *Pak*, 906 F.2d 679, 683 (Fed. Cir. 1990) (noting that "[a] preliminary injunction is a drastic remedy"

16  and that "[t]he hardship on a preliminarily enjoined manufacturer who must withdraw its product from

17  the market before trial can be devastating").

18         Instead, it is clear from BNEA's allegations and this Motion, BNEA seeks to harm AtGames.

19  Indeed, AtGames believes these allegations are in retaliation of its purchase of GCC's royalty rights.

20  Hsiung Decl., ¶¶23-24; Zhang Decl., Ex. A.  BNEA's Complaint has already hit the media and has

21  resulted in negative publicity.  Hsiung Decl., ¶25.  BNEA is seeking to punish AtGames for entering

22  into a contract with GCC that BNEA had hoped to secure for itself.  BNEA's counsel admitted as

23  much when it wrote to AtGames counsel.  Zhang Decl., Ex. A.  But, when a party requests equitable

24  relief—like the preliminary injunction sought here—they must not have unclean hands.  In the words

25  of the old axiom: "he who seeks equity must do equity."  *In re Mortgage Elec. Registration Systems*

26  *(MERS) Litigation*, No. CV-10-630-PHX-JAT,  2010 WL 11475611, *3 (D. Ariz. Jun. 11, 2010); *see*

27  *also Precision Instrument Mfg. Co. v. Auto Maint. Mach. Co.*, 324 U.S. 806, 815 (1945) ("Any willful

28  act [which] transgress[es] equitable standards of conduct is sufficient cause" to deny and injunction);

OPPOSITION TO TRO AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:19-cv-05898-VC

1    *Silvas v. G.E. Money Bank*, 449 Fed. Appx. 641, 644 (9th Cir. 2011) (affirming denial of preliminary

2    injunction based on doctrine of unclean hands).

3           Here, if this court were to grant a preliminary injunction, it would have a chilling effect on

4    AtGames' reputation and goodwill and other business and condone BNEA's harmful retaliation

5    against AtGames.  Hsiung Decl., ⁋25.  Injury to defendant's goodwill is an important factor for the

6    denial of a preliminary injunction.  In *Galaxy Chemical Co. v. BASF Corp*., 11 U.S.P.Q.2d 1279 (N.D.

7    Ill. 1989), one district court explained: "Skepticism would develop in the marketplace. [Defendant's

8    customers] would no doubt become more concerned about [defendant's] products. The resultant

9    consumer concern would no doubt cause damage to the sales of [defendant's other products] … The

10   goodwill lost as a result of the erosion of consumer confidence and trust in [defendant's] products

11   would be substantial and cannot be adequately measured in monetary terms."  This instant case

12   presents facts more compelling to deny preliminary injunction compared to the facts *Galaxy Chemical*

13   *Co*., supra.

14          Indeed, AtGames' customers, *i.e*., retailers such as Walmart and GameStop, have purchased

15   and do purchase many other products sold by AtGames, including have purchased AtGames' products

16   licensed by BNEA in 2016 and 2018 pursuant to those license agreements.  Hsiung Decl., ⁋⁋2-3.  If

17   the Court grants plaintiff's request for a preliminary injunction, the negative impact to AtGames'

18   goodwill and reputation would be severe and irreparable.  Indeed, retailers may assume that since the

19   Court granted the present injunction, the allegations in the Complaint against AtGames are true.

20   Moreover, AtGames' customers might begin questioning whether other products sold by AtGames are

21   the subject of the injunction or infringe IP rights of third parties.  The substantial goodwill AtGames

22   has built over the last 18 years in gaming industry will be diminished.  Hsiung Decl., ⁋15.  AtGames'

23   reputation in the industry will be downgraded from a respected supplier to retailers to an IP infringer.

24   Undoubtedly, AtGames will be irreparably harmed.  BNEA, on the other hand, would not be harmed

25   by the denial of an injunction.  Thus, the harm to AtGames substantially outweighs any purported

26   harm to BNEA.

27          **D.      An Injunction Would Not Serve the Public Interest**

28          The public interest is not served by BNEA's effort to enjoin AtGames from doing activities

which AtGames has already confirmed it is not doing, and which have--and have had--no impact on the public.

**V.      CONCLUSION**

For the foregoing reasons, and those to be offered at the hearing, BNEA's request for a preliminary injunction should be denied.

DATED:  October 31, 2019                                 Respectfully submitted,

                                                        **DENTONS US LLP**

                                                        By:  */s/ Jennifer D. Bennett*

                                                        Jennifer D. Bennett
                                                        Jennifer.Bennett@dentons.com
                                                        Jinshu "John" Zhang
                                                        John.Zhang@dentons.com

                                                        *Attorneys for Defendant*

OPPOSITION TO TRO AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:19-cv-05898-VC

**CERTIFICATE OF SERVICE**

I, Jennifer Bennett, hereby declare:

I am employed in the City and County of San Francisco, California in the office of a member of the bar of this court whose direction the following service was made.  I am over the age of eighteen years and not a party to the within action.  My business address is Dentons US LLP, One Market Plaza, Spear Tower, 24th Floor, San Francisco, California  94105.

On October 31, 2019, the following documents, described as:

**DEFENDANT ATGAMES HOLDINGS, LTD.'S OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A  PRELIMINARY INJUNCTION SHOULD NOT BE GRANTED (Dkt No. 14)**

to be served via CM/ECF by the Clerk of the Court, upon all counsel of record registered to receive electronic filing, as indicated on the Court's website, or by United States Mail, upon those parties not registered for electronic filing.

I declare under penalty of perjury that the above is true and correct.  Executed on October 31, 2019, in San Francisco, California.

_____ */s/ Jennifer D. Bennett* _____
Jennifer D. Bennett