1  Jinshu "John" Zhang (Bar No. 166981)
   John.Zhang@dentons.com
2  DENTONS US LLP
   601 S. Figueroa Street
3  Suite 2500
   Los Angeles, California 90017-5704
4  Tel: 213-623-9300

5  Jennifer D. Bennett (Bar No. 235196)
   Jennifer.Bennett@dentons.com
6  DENTONS US LLP
   One Market Plaza, Spear Tower, 24th Floor
7  San Francisco, California 94105
   Tel: 415-267-4000

8
   *Attorneys for Defendant*
9  AtGames Holdings, Ltd.

10              **UNITED STATES DISTRICT COURT**

11            **NORTHERN DISTRICT OF CALIFORNIA**

12               **SAN FRANCISCO DIVISION**

13

14                                          | **Case No.: 3:19-cv-05898-VC**

15  BANDAI NAMCO ENTERTAINMENT              **DEFENDANT ATGAMES HOLDINGS,**
    AMERICA INC.                            **LTD.'S CORRECTED OPPOSITION TO**
16                                          **PLAINTIFF'S *EX PARTE* APPLICATION**
                          Plaintiff,        **FOR A TEMPORARY RESTRAINING**
17                                          **ORDER AND ORDER TO SHOW CAUSE**
         vs.                                **WHY A  PRELIMINARY INJUNCTION**
18                                          **SHOULD NOT BE GRANTED (Dkt No. 14)**
    ATGAMES HOLDINGS, LTD.; and DOES 1
19  through 50,                             **Date: November 14, 2019**
                                            **Time: 10 a.m.**
20                        Defendants.       **Courtroom: 4**
                                            **Judge: Judge Vince Chhabria**
21

22

23

24

25

26

27

28

---

OPPOSITION TO TRO AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:19-cv-05898-VC

1

**TABLE OF CONTENTS**

2

**Page**

3    I.     INTRODUCTION.................................................................................................. 1

4    II.    FACTUAL BACKGROUND.................................................................................. 4

5          A.   The Parties' Pre-Existing Licensing Relationship and AtGames'
6                Efforts to Obtain a License to Ms. Pac-Man .......................................... 4

7          B.   BNEA Gives AtGames Permission to Make Ms. Pac-Man Dongle and
                 Discuss Ms. Pac-Man with Retailers; AtGames Creates Conceptual
8                Brochures and Prototypes ........................................................................ 4

9          C.   AtGames Acquires GCC's Interest in Ms. Pac-Man, Which BNEA
                 Had Hoped to Secure for Itself ............................................................... 5

10         D.   BNEA Retaliates Against AtGames........................................................ 5

11         E.   The Pac-Man Products Were Lucrative for Both AtGames and BNEA.......... 6

12   III.   LEGAL STANDARD ........................................................................................... 7

13   IV.    ARGUMENT ....................................................................................................... 7

14         A.   Plaintiff Fails to Show a Likelihood of Success on the Merits.......................... 7

15              1.   Plaintiff's Lanham Act Allegations and Related Business
                     Torts are Unlikely to Succeed........................................................ 7

16
17              2.   Plaintiff's Copyright Infringement Allegations Are
                     Unlikely to Succeed........................................................................ 9

18         B.   Plaintiff Fails to Show a Likelihood of Irreparable Harm Absent an
19              Injunction ............................................................................................... 11

20         C.   The Balance of Equities Weigh Against an Injunction................................... 14

21         D.   An Injunction Would Not Serve the Public Interest ......................................... 15

     V.    CONCLUSION................................................................................................... 15

22

23

24

25

26

27

28

OPPOSITION TO TRO AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:19-cv-05898-VC

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012) .................................................................13

5

*Alto Velo Racing Club v. Rouleur Sports Grp., LLC*,
6   No. 5:15-cv-02144-PSG, 2015 WL 5462055 (N.D. Cal. Sept. 17, 2015) ........11

7  *AMF Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979) ...........................................................................7

8

*ArcSoft, Inc. v. CyberLink Corp.*,
9   153 F. Supp. 3d 1057 (N.D. Cal. 2015) .........................................................11

10  *Caribbean Marine Servs. Co. v. Baldrige*,
     844 F.2d 668 (9th Cir. 1988) ........................................................................11

11

*Coates-Freeman Associates, Inc. v. Polaroid Corp.*,
12   792 F. Supp. 879 (D. Mass. 1992) .................................................................10

13  *Cutting Edge Solutions, LLC v. Sustainable Low Maint. Grass, LLC*,
     2014 WL 5361548 (N.D. Cal. Oct. 20, 2014) ...............................................14

14

*Enterprise Rent-A-C ar Co. v. Advantage Rent-A-Car, Inc.*,
15   330 F.3d 1333 (Fed. Cir. 2003) .....................................................................14

16  *Evolv, LLC v. Joyetech USA, Inc.*,
     No. 16-459, 2016 WL 7507761 (C.D. Cal. May 3, 2016) .............................13

17

*Galaxy Chemical Co. v. BASF Corp.*,
18   11 U.S.P.Q.2d 1279 (N.D. Ill. 1989) .............................................................15

19  *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*,
     736 F.3d 1239 (9th Cir. 2013) .........................................................11, 12, 13

20

*Knickerbocker Toy Co., Inc. v. Azrak-Hamway Int'l, Inc.*,
21   668 F.2d 699 (2d Cir. 1982) ..........................................................................11

22  *Koller v. Brown*,
     224 F. Supp. 3d 871 (N.D. Cal. 2016) .............................................................7

23

*Levi Strauss & Co. v. Papikian Enterprises, Inc.*,
24   No, 2011 WL 5192237 (N.D. Cal. Nov. 1, 2011) ......................................9, 10

25  *In re Mortgage Elec. Registration Systems (MERS) Litigation*,
     No. CV-10-630-PHX-JAT, 2010 WL 11475611 (D. Ariz. Jun. 11, 2010) ......14

26

*Nautilus Group, Inc. v. ICON Health and Fitness, Inc.*,
27   372 F.3d 1330 (Fed. Cir. 2004) .......................................................................9

28

*Nutri/System, Inc. v. Con-Stan Indus., Inc.*,
   809 F.2d 601 (9th Cir. 1987) ........................................................................................................8

*Official Airline Guides, Inc. v. Goss*,
   6 F.3d 1385 (9th Cir. 1993) ........................................................................................................8

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ..................................................................................................10

*Scotts Co. v. United Industries Corp*.,
   315 F3d 264 (4th Cir. 2002) ....................................................................................................14

*Signeo USA, LLC v. SOL Republic, Inc.*,
   No. 5:11-CV-06370-PSG, 2012 WL 2050412 (N.D. Cal June 6, 2012)...........................................8

*Silvas v. G.E. Money Bank*,
   449 Fed. Appx. 641 (9th Cir. 2011) .........................................................................................14

*Solidus Networks, Inc. v. Excel Innovations, Inc.*,
   502 F.3d 1086 (9th Cir. 2007) ..................................................................................................11

*Swisher Mower & Machine Co., Inc. v. Haban Manuf'g, Inc.*,
   931 F. Supp. 645 (W.D. Mo. 1996) ....................................................................................10, 11

*Taimani v. Residential Mortgage Loan Trust 2013-TT2*,
   No. 16-cv-02992-YGR, 2016 WL 917877 (N.D. Cal. Jun. 7, 2016) ..............................................7

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
   610 F.3d 1171 (9th Cir. 2010) ....................................................................................................9

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc*, No. 12-cv-03856 PJH, 014 WL
   4312021 (N.D. Cal. Aug. 28, 2014) .....................................................................................12, 14

*Williams v. Green Valley RV, Inc.*,
   No. 15-cv-01010, 2015 U.S. Dist. LEXIS 103409, 2015 WL 4694075 (C.D. Cal.
   Aug. 6, 2015).......................................................................................................................11

*Winter v. Natural Res. Def. Council, Inc.*,
   129 S. Ct. 365 (2008) .................................................................................................................7

**Statutes**

17 U.S.C.
   § 107 ......................................................................................................................................10

Lanham Act ...........................................................................................................................3, 7, 8

**Rules and Regulations**

Federal Rules of Evidence
   Rule 602................................................................................................................................12
   Rule 801............................................................................................................................12, 13

# I.     **INTRODUCTION**

This case purports to involve allegations that Defendant AtGames Holdings, Ltd. ("AtGames") is infringing intellectual property ("IP") rights in the Ms. Pac-Man video game.  However, despite Plaintiff Bandai Namco Entertainment America, Inc. ("BNEA")'s voluminous submissions on this motion, there is evidence only of a few *de minimis* uses of IP in Ms. Pac-Man--and they do not constitute infringement.  To the extent BNEA complains about AtGames merely discussing a hypothetical Ms. Pac-Man product with retailers, AtGames did so with BNEA's knowledge and permission while they were engaged in advanced business discussions; in any event, there is nothing unlawful about discussing a potential product as long as IP rights are not infringed and the parties are clear about who owns the IP rights.  That is all that happened here.  For avoidance of doubt, AtGames is **not** marketing, advertising, distributing, promoting, offering to sell, or selling any product, packaging, or any other item of any kind that uses, includes, or incorporates Ms. Pac-Man IP.   No such AtGames commercial product even exists.

AtGames has long sought a license to Ms. Pac-Man from BNEA.  As is customary in the gaming industry, while the parties were discussing a license, AtGames made **three** prototypes of a home arcade product that included Ms. Pac-Man.  One of those prototypes was sent to the inventor and royalty right holder of Ms. Pac-Man, Mr. Curran of General Computer Company ("GCC"), in the hope that he would help AtGames obtain a license to Ms. Pac-Man from BNEA.  Obviously, Mr. Curran was not a consumer and he understood AtGames did not own rights to Ms. Pac-Man.  Indeed, acquiring such rights was the purpose of their communications.  Thus, it was impossible for Mr. Curran to be confused as to the origin of the prototype, nor were any false or misleading statements made to Mr. Curran about AtGames' rights to Ms. Pac-Man.  The other prototypes, made for internal testing, are in AtGames' possession and not being shown or displayed to the public.

The only other use of Ms. Pac-Man IP for which BNEA provides any evidence are internal "concept" marketing brochures that depict how AtGames might market a Ms. Pac-Man product if it obtained a license, after BNEA had expressly given a written "ok" for the Ms. Pac-Man product.  The conceptual brochures were designed for internal use, although they were sent confidentially to a sales representative almost a year ago.  The conceptual brochures have not been displayed to the public, nor

1    are there any plans for them to be displayed to the public.  In fact, the hypothetical Ms. Pac-Man

2    product in the conceptual brochures was never even made--and AtGames fully understands it cannot

3    make or sell such a product without a license from BNEA.

4        Given that AtGames currently is not making any use of Ms. Pac-Man IP, it has repeatedly

5    expressed its willingness to render the instant motion moot by stipulating that it will not use Ms. Pac-

6    Man IP unless and until it obtains a license from BNEA.  Yet, in a clear effort to hurt AtGames'

7    reputation, BNEA rejected AtGames' offer and moved forward with this motion.

8        Why, if AtGames is not actually making or selling Ms. Pac-Man products, has BNEA chosen

9    to litigate with AtGames and bring the instant motion?  The answer is that BNEA is seeking to punish

10   AtGames for entering into a contract with a third-party (the above-referenced GCC) that BNEA had

11   hoped to secure for itself.  BNEA's counsel admitted as much when it wrote to AtGames counsel:

12   > AtGames has the opportunity to preserve its current relationship and license
13   > agreements and potential future opportunities with Bandai Namco, ***so long as***
     > ***AtGames complies with Bandai Namco's request, i.e. that AtGames rescinds***
14   > ***whatever offer it has proposed to GCC*** relative to assignment of the agreement
     > between Bandai Namco and them,... ***If that commitment is not forthcoming by***
15   > ***close of business today, i.e. by 6:00 pm Pacific today August 27, 2019, BNEA***
     > ***will immediately terminate its current license agreements with AtGames, and***
16   > ***will permanently remove AtGames as a partner with which it conducts***
     > ***business***.

17   (August 27, 2019 e-mail attached as **Exhibit A** to Declaration of Jinshu John Zhang in
18   support of Defendant's Opposition ("Zhang Decl.,") (emphasis added).

19       BNEA's motion papers obscure the fact that AtGames has long been a licensee of BNEA for

20   games such as PAC-MAN and have been in advanced and transparent business discussions for over a

21   year about Ms. Pac-Man.  As business partners, AtGames has generated a lot of royalty revenue for

22   BNEA (including, notably, revenue that BNEA readily accepted for the very AtGames PAC-MAN

23   products that BNEA now disparages in its motion--but which BNEA had reviewed and approved

24   before they were on the market).  When AtGames sought to obtain license rights from BNEA for Ms.

25   Pac-Man, it was advised that BNEA would not grant such a license while an unidentified "third

26   party," which AtGames later learned was GCC, owned certain rights and revenue streams.  BNEA's

27   goal was to acquire GCC's rights cheaply, without first disclosing to GCC the millions of dollars of

28   guaranteed advance royalties offered by companies such as AtGames, so that it (BNEA) could make

1   more profit from the monetization of Ms. Pac-Man.  Instead, AtGames acquired GCC's rights in Ms.

2   Pac-Man based on the hope and expectation that BNEA would grant a license to AtGames so that

3   AtGames could make both companies a lot of money by selling Ms. Pac-Man products.  BNEA,

4   however, was infuriated by AtGames' acquisition of GCC's rights (which it had hoped to secure for

5   itself on the cheap through improper withholding of information from GCC about the true revenue

6   prospects for Ms. Pac-Man), so BNEA retaliated.  Its retaliation included manufacturing reasons why

7   AtGames was suddenly in breach of the Pac-Man licensing agreements and purporting to terminate

8   these agreements.  BNEA's retaliation also included the filing of this suit, which deals with--at most--

9   trifling and *de minimis* uses of Ms. Pac-Man IP.  And, BNEA's retaliation also includes the instant

10   motion and the negative public attention it will bring to AtGames.  BNEA's conduct in this regard

11   constitutes unclean hands, and is itself a valid basis for denying the equitable relief that BNEA seeks.

12       The Court should deny the requested preliminary injunction for several additional reasons.

13   *First*, BNEA is unlikely to succeed on any of its claims.  BNEA's Lanham Act and related business

14   tort allegations fail because BNEA has presented no evidence of any consumer confusion, false

15   statements, false advertising or unfair competition.  Those claims and BNEA's copyright claims fail

16   because AtGames' extremely limited use of Ms. Pac-Man IP on three prototypes and internal

17   "concept" brochures constitute fair use and/or *de minimis* use.

18       *Second*, BNEA utterly fails to meet its burden to demonstrate irreparable harm.  Setting

19   Plaintiff's speculation and hyperbole to the side, this case concerns three allegedly infringing

20   prototypes and internal concept marketing brochures.  But there is no evidence those items were ever

21   displayed to the public, much less that such display is ongoing.  Moreover, one of the prototypes is in

22   Mr. Curran's, not AtGames', possession, and there is no evidence that Mr. Curran is trying to sell the

23   prototype to the public, not to mention that Mr. Curran is one of the inventors of Ms. Pac-Man and

24   knows exactly who owns the licensing right thereto.  Thus, any claim of irreparable harm is belied by

25   the fact that there is no ongoing alleged infringement, there is no evidence that any infringement has

26   had any impact on BNEA in the marketplace, and AtGames has actually offered to stipulate that it will

27   not advertise, make or sell any Ms. Pac-Man product pending a license from BNEA.

28       The great irony in this case is that AtGames has always understood, taken the position, and

OPPOSITION TO TRO AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:19-cv-05898-VC

communicated to anyone who would listen that it is not authorized to sell Ms. Pac-Man without a license from BNEA.  And, AtGames has no intention of doing so.  Thus, far from preventing imminent or irreparable harm, an injunction would only serve to prevent AtGames from doing things it already is not doing and has offered to promise BNEA it will not do.

## II.    FACTUAL BACKGROUND

### A.    The Parties' Pre-Existing Licensing Relationship and AtGames' Efforts to Obtain a License to Ms. Pac-Man

AtGames has successfully entered into two lucrative licensing relationships with BNEA for other BNEA video games (including Pac-Man) for use in AtGames' products, including in October 2016 and July 2018.  (*See* Declaration of Dr. Ping-Kang Hsiung in support of AtGames' Opposition to Plaintiff's Application ("Hsiung Decl."), ¶3).  Throughout 2018 and 2019, AtGames was in serious and advanced business discussions with BNEA regarding AtGames' development of gaming products with Ms. Pac-Man.  *Id.*, ¶6-10.  Throughout these business discussions, as common in the industry, AtGames was transparent with BNEA as to the gaming products that AtGames wanted to develop, was transparent that AtGames was talking to retailers and sent to BNEA an image of a potential AtGames Ms. Pac-Man product at the retail shelf.  *Id.;* Exs. 1-2; 4.

### B.    BNEA Gives AtGames Permission to Make Ms. Pac-Man Dongle and Discuss Ms. Pac-Man with Retailers; AtGames Creates Conceptual Brochures and Prototypes

Since October 2018, AtGames understood it had BNEA's approval for its Ms. Pac-Man HDMI Dongle, but that the home arcade would take more time given a third-party issue.  *Id.*, ¶11; Exs. 4 -5.  AtGames proceeded to discuss with retailers the potential Ms. Pac-Man product.  *Id.*, ¶8.  AtGames has never told anyone, including at GameStop or Walmart, that AtGames has or ever had a license to Ms. Pac-Man.  *Id.,* ¶8.  AtGames has only ever represented that it was trying to obtain and would like to obtain a license to Ms. Pac-Man from BNEA.  *Id.*  But, in accord with industry practice and BNEA's expectations, AtGames discussed the potential products with retailers.  *See* Hsiung, ¶7, Ex. 1.

AtGames also mocked up concept marketing brochures which depicted how AtGames might market a Ms. Pac-Man product if it obtained the license from BNEA .  Hsiung Decl., ¶12.  They were shared confidentially with AtGames' sales representatives, Peake Marketing, for feedback.  *Id*. A

- 4 -

1    similar rendering was shared with BNEA and BNEA did not object to it.  *Id.* ¶13; Exs. 1-2.  The

2    conceptual Ms. Pac-Man Dongle product in the conceptual brochures was never made.  *Id.,* ¶12.

3            AtGames also made one mock-up prototype to send to Kevin Curran, one of the inventors and

4    a royalty right owner of Ms. Pac-Man, so Mr. Curran help AtGames with its pending licensing request

5    and two mock-up prototypes for AtGames' internal testing/study and to later send to BNEA for their

6    feedback and approval.  Hsiung Decl.*,* ¶¶18-21.  These are the only prototypes AtGames has ever

7    made with Ms. Pac-Man.  *Id.,* ¶21.  These prototypes were never shown, displayed, marketed,

8    advertised, offered for sale or sold to the public.  *Id.*

9        **C.     AtGames Acquires GCC's Interest in Ms. Pac-Man, Which BNEA Had Hoped to
                Secure for Itself**
10

11           Through online research, AtGames learned about the development story of Ms. Pac-Man and

12   that GCC, a group of MIT students, including, Steve Golson and Kevin Curran, had developed Ms.

13   Pac-Man in the 1980s and that GCC owned certain royalty rights in Ms. Pac-Man.  Hsiung Decl., ¶14.

14           AtGames subsequently reached out to GCC to see if they could help AtGames obtain a Ms.

15   Pac-Man license and also to collaborate with GCC including, to create new games and to create

16   education STEM products to teach young children and girls how to program.  *Id.,* ¶15.  In August

17   2019, PK Hsiung of AtGames met with Kevin Curran to discuss potential collaborations and learned

18   that GCC only had a royalty sharing right and that BNEA had offered to buy GCC's rights and BNEA

19   did not tell GCC about the pending requests to license Ms. Pac-Man from BNEA.  *Id.,* ¶¶16-17.  After

20   the in-person meetings, AtGames made one Ms. Pac-Man arcade prototype and shipped it to Kevin

21   Curran.  *Id.*, ¶¶18-19.  AtGames and GCC also entered into a licensing support agreement on August

22   16, 2019.  Hsiung Decl., ¶18; Ex. 6.  AtGames agreed to pay a 5% royalty to GCC so that BNEA

23   could keep AtGames' royalty and would not need to share its royalty with GCC.  *See id.*, ¶¶3-4.

24       **D.     BNEA Retaliates Against AtGames**

25           After learning that AtGames had talked to GCC, BNEA threatened AtGames to back off from

26   contacting GCC or he would terminate AtGames' agreements for Pac-Man.  Hsiung Decl., ¶¶22-23;

27   Ex. 8, Aug. 22, 2019 email from Dr. Hsiung.  This was also communicated to AtGames' counsel.  *See*

28   Zhang Decl., Ex. A.  On August 27, 2019, BNEA sent a notice to terminate the 2016 and 2018

OPPOSITION TO TRO AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:19-cv-05898-VC

1   agreements.  Hsiung Decl., ¶24.  AtGames believes the only reason BNEA wanted to terminate the

2   2016 and 2018 license agreements with AtGames is because BNEA wanted to buy GCC's royalty

3   rights for itself.  *Id.*, ¶24.  Very recently, before learning of the AtGames' deal with GCC, AtGames

4   was working with BNEA for the 40th anniversary of Pac-Man.  *See* Hsiung Decl, ¶24; Ex. 5.

5          AtGames repeatedly agreed to stipulate to that it would not market, advertise, distribute,

6   promote, offer to sell, or sell any product, packaging, or any other item of any kind that uses, includes,

7   or incorporates Ms. Pac-Man.  *See e.g.,* Zhang Decl., Ex. E; Hsiung Decl., ¶4.  At no time did

8   AtGames' counsel or anyone from AtGames threaten to launch any Ms. PAC-MAN game on October

9   7, 2019 or any other date before a license was obtained from BNEA.  *See* Zhang Decl., ¶¶3-7, Exs. B-

10  D.  Instead, BNEA's counsel appeared to be working with AtGames' counsel to communicate

11  important deadlines to BNEA, to the extent the parties were to come to an agreement on a license, so

12  that the products would be available for this holiday season.  *Id.*

13         **E.     The Pac-Man Products Were Lucrative for Both AtGames and BNEA**

14         While this litigation concerns only Ms. Pac-Man, BNEA's motion seeks to distract the Court

15  by focusing predominantly on a different game--Pac-Man--and it disparages the Pac-Man product that

16  AtGames sold.  There are multiple versions of PAC-MAN games, including several for the home

17  consoles (the "Home Version") and one for the original arcade (the "Arcade Version").  Declaration of

18  Jodie Lee in Support of AtGames' Opposition to BNEA's Application, ("Lee Decl."), ¶4.  AtGames

19  submitted the product packaging as well as the Home Version video to BNEA for approval in or

20  around June of 2018, and BNEA approved the product.  *Id.,* ¶5.  BNEA provided AtGames with

21  images for the Home Version's box art.  *See* Lee Decl., ¶¶5-6; Lee Exhibit 1.  AtGames' submission

22  included a screenshot of the Home Version in "landscape" format, which is representative of most

23  consumers' experience for home console games.  *See* Lee Decl., ¶6.

24         During the packaging approval process, BNEA requested that AtGames change the box art for

25  the Home Version so that it would use a screenshot of the Pac-Man Game in the "vertical" format,

26  which is representative of most consumers' experience for the Arcade Version.  *Id.*, ¶¶7-9; Lee

27  Exhibit 3.  AtGames made the change to the box art that BNEA had requested, and it proceeded to

28  distribute the Home Version as approved by BNEA.  *Id.*, ¶9.  When the Home Version was sold to

consumers, some customers identified that the home console version (*i.e.*, in landscape) game did not match the arcade (*i.e.* in portrait "horizontal") screenshot that AtGames had added to the box art at BNEA's request. *See* Lee Decl., ¶10.  This mismatch between the box art and the home console version is the source of the so-called problems with the PAC-MAN product. *Id.*, ¶10.  BNEA at all times continued to collect royalties on AtGames' sale of the Home Version. *Id.*, ¶12.

## III.   LEGAL STANDARD

"A preliminary injunction is an 'extraordinary and drastic remedy' that is never awarded as of right." *Taimani v. Residential Mortgage Loan Trust 2013-TT2*, No. 16-cv-02992-YGR, 2016 WL 917877, *1 (N.D. Cal. Jun. 7, 2016).  When seeking a preliminary injunction, a plaintiff bears the burden to establish four factors, namely that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Taimani*, 2016 WL 917877, *1, *citing Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008).  "An adequate showing of irreparable harm is the 'single most important prerequisite for the issuance of a [TRO]." *Koller v. Brown*, 224 F. Supp. 3d 871, 879 (N.D. Cal. 2016).

## IV.   ARGUMENT

### A.   Plaintiff Fails to Show a Likelihood of Success on the Merits

#### 1.   Plaintiff's Lanham Act Allegations and Related Business Torts are Unlikely to Succeed

When seeking a preliminary injunction, Plaintiff must prove that it is likely to succeed on the merits.  Plaintiffs have not shown a likelihood of success on the merits on any of its counts.  The *sine qua non* of a trademark infringement claim under the Lanham Act is whether the defendant has made unauthorized use of a trademark in a manner likely to cause "consumer confusion."[1]

Each of Plaintiff's Lanham Act claims must fail because it is impossible that AtGames' use of

---

[1] To demonstrate likely confusion, a plaintiff must show that the "Sleekcraft" factors weigh decidedly in its favor. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979).  As discussed herein, it was impossible that the prototypes and brochures led to confusion because they were not disclosed to the public.  This dooms Plaintiff's likelihood of success.  Thus, AtGames need not respond to BNEA's analysis of the other factors in its Opposition.

1    the trademarks could have caused confusion, mistake or deception.  Indeed, fatal to BNEA's motion,

2    BNEA has offered **no** evidence of likely or actual confusion.  Mot., p. 7.  This is because BNEA

3    knows there has been no confusion, nor could there be.  The one (1) person to whom AtGames sent

4    the prototype was Mr. Curran.  Hsiung Decl., ¶¶18-19.  But, he had intimate knowledge of which

5    parties owned the rights to Ms. Pac-Man, as he had long been involved in the creation and

6    monetization of those rights.  *Id.*  And, the context of the alleged disclosure to Mr. Curran--*i.e.,*

7    AtGames seeking to acquire his portion of the rights to Ms. Pac-Man in the hope that BNEA might be

8    persuaded to grant AtGames a license to Ms. Pac-Man--confirms that it was impossible for him to be

9    confused about who held Ms. Pac-Man's trademark rights.  In any event, Mr. Curran was not a

10   prospective purchaser of the AtGames prototype.  "[T]he key inquiry is confusion of prospective

11   purchasers."  *Signeo USA, LLC v. SOL Republic, Inc*., No. 5:11-CV-06370-PSG, 2012 WL 2050412,

12   *7 (N.D. Cal June 6, 2012).  There is no evidence of any confusion of prospective purchasers.

13          Similarly, the sales representatives at Peake Marketing who, under confidentiality obligations,

14   received the "concept" marketing brochures for feedback would not be confused about who held the

15   Ms. Pac-Man rights, or the source/origin of a hypothetical Ms. Pac-Man product.  Hsiung Decl., ¶12.

16   Indeed, the "concept" brochures themselves expressly state "product concept," "upon licensor

17   approval" and "internal communications."  Peake Decl., Dkt No. 14-34 (Ex. D, pp. 1, 5, 34); Dkt No.

18   14-32 (Ex. B. pp. 1, 6, 23).  And Peake Marketing, like Mr. Curran, was not a prospective purchaser or

19   customer, but tantamount to "internal" people, who worked with AtGames.  And, a similar mock-up

20   had been sent to BNEA who given the advanced nature of their business discussions, not surprisingly,

21   did not state such rendering was improper or unauthorized.  *See e.g.,* Hsiung Decl., ¶13; Exs. 1-2.

22          Additionally, even if Mr. Curran or Peake Marketing were confused (they were not), such *de*

23   *minimis* confusion is not sufficient to establish likely confusion within the meaning of the Lanham

24   Act.  *See Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993) (evidence of seven

25   misdirected mailings out of 80,000 total mailings *de minimis* and not persuasive of likely confusion);

26   *Nutri/System, Inc. v. Con-Stan Indus., Inc*., 809 F.2d 601, 606 (9th Cir. 1987) (given parties' high

27   volume of business, evidence of several instances of misdirected letters and checks "at best, were thin,

28   and at worst were trivial"); *Nautilus Group, Inc. v. ICON Health and Fitness, Inc.*, 372 F.3d 1330,

OPPOSITION TO TRO AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:19-cv-05898-VC

1    1338 (Fed. Cir. 2004) (four misdirected phone calls out of thousands "relatively small number …too

2    unreliable to establish actual confusion.").

3         Finally, to the extent the trademark claim is based on AtGames' use of the term "Ms. Pac-

4    Man" in private business discussions, it must fail because a defendant's use of a trademarked name to

5    refer to the product itself is classic example of nominative fair use.  Put simply, trademark law does

6    not prevent a person from calling a product by its trademarked name.  As the Ninth Circuit explained:

7              [W]e've held that the *Sleekcraft* factors [i.e., the factors applicable to
               determining consumer confusion in a trademark infringement analysis]
8              doesn't apply where a defendant uses the mark to refer to the
               trademarked good itself.  *See Playboy Enters., Inc. v. Welles,* 279 F.3d
9              796, 801 (9th Cir. 2002); *New Kids on the Block v. News Am. Publ'g,
               Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).
10

11   *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175 (9th Cir. 2010).  "[A] defendant may

12   avail himself of the nominative fair use doctrine if 'the use of the trademark does not attempt to

13   capitalize on consumer confusion or to appropriate the cachet of one product for a different one.'"

14   *Levi Strauss & Co. v. Papikian Enterprises, Inc.*, No. 2011 WL 5192237, *3 (N.D. Cal. Nov. 1, 2011),

15   quoting *New Kids*, 971 F.2d at 307-308.  When analyzing nominative fair use issues, a court is to

16   consider whether "(1) the product was 'readily identifiable' without the use of the mark; (2) defendant

17   used more of the mark than necessary; or (3) defendant falsely suggested he was sponsored or

18   endorsed by the trademark holder."  *Id.*  Here, these factors compel a finding of nominative fair use.

19        *First*, there is no way to readily and accurately identify the Ms. Pac-Man video game without

20   using the term "Ms. Pac-Man."  *Second*, to the extent Defendant was discussing Ms. Pac-Man with

21   anyone, it was accurately referring to the game by its name--which can hardly be considered excessive

22   use.  *Third*, and finally, Defendant never depicted itself as sponsored or endorsed by BNEA; to the

23   contrary, Defendant has always understood and communicated that it cannot enter into any business

24   deals for Ms. Pac-Man unless and until it receives a license from BNEA.  Hsiung Decl., ¶¶5, 8.

25        Even assuming, arguendo, nominative fair use did not apply, AtGames' use of the Ms. Pac-

26   Man trademarks would be fair use because it was *de mininimis* in nature.

27        **2.     Plaintiff's Copyright Infringement Allegations Are Unlikely to Succeed**

28        While in advanced business discussions with BNEA, AtGames has only ever made **three**

OPPOSITION TO TRO AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:19-cv-05898-VC

1    prototypes of a concept Ms. Pac-Man home arcade and "product concept" marketing brochures for the

2    Dongle for internal purposes.  Hsiung Decl., ¶¶12, 21.  AtGames has never shown or displayed any

3    prototype or the "concept" marketing brochures to the public.  *Id.*  Indeed, the "concept" marketing

4    brochures were provided to Peake Marketing, AtGames' sales representatives, under confidentiality

5    obligations, to seek feedback.  *Id.*, ¶12.

6        AtGames' *de minimis* use is permitted under the fair use doctrine.  "The fair use defense

7    permits the use of copyrighted works without the copyright owner's consent under certain situations."

8    *Perfect 10, Inc. v. Amazon,com, Inc.*, 508 F.3d 1146, 1163 (9th Cir. 2007).  The fair use defense is

9    codified in 17 U.S.C. § 107, in relevant part, as follows:

10        (1) the purpose and character of the use, including whether such use is of a
          commercial nature or is for nonprofit educational purposes;
11        (2) the nature of the copyrighted work;
          (3) the amount and substantiality of the portion used in relation to the
12        copyrighted work as a whole; and
          (4) the effect of the use upon the potential market for or value of the
13        copyrighted work.

14        Here, AtGames' minimal use qualifies as fair use for at least two reasons: (1) the purpose and

15    character of the use was extremely limited--*i.e.,* it was part of a prototype or concept that was not

16    publicly offered or sold, and it was shown to a very limited number of people [Factor 1], and (2) the

17    use had no impact on the potential market or value of the copyrighted work, as no one in the market

18    was even aware of the use [Factor 4].

19        AtGames' position is amply supported by the case law.  For example, in *Coates-Freeman*

20    *Associates, Inc. v. Polaroid Corp.*, 792 F. Supp. 879 (D. Mass. 1992), the defendant incorporated two

21    copyrighted works into prototypes.  *Id.* at 887.  The prototypes in *Coates-Freeman,* as the prototypes

22    and brochure here, were not disseminated outside of Polaroid, therefore the court found "there [was]

23    no evidence that would support either a finding or conclusion that any limited infringement that may

24    have taken place had any effect on the market for or value of the [copyrighted work]."  *Id.*  Indeed, the

25    Court found that Polaroid's use "did not even deprive [plaintiff] of a sale."  *Id.*  Thus, "the taking was

26    so limited in scope and nature that [plaintiff] cannot reasonably complain."  *Id.*

27        Similarly, in *Swisher Mower & Machine Co., Inc. v. Haban Manuf'g, Inc.*, 931 F. Supp. 645,

28    648 (W.D. Mo. 1996), the court found "only one Haban Prototype Mower was ever manufactured and

- 10 -

1  it was never sold," therefore "the general maxim *de minimis non curat lex*--that is, the law does not

2  care for trifling matters--is applicable to Swisher's infringement claim with regard to the prototype."

3  *Id.* at 648.  Therefore, the court determined that the prototype mower "will not be considered."  *Id.*

4  The Court of Appeals for the Second Circuit reached a similar conclusion in *Knickerbocker*

5  *Toy Co., Inc. v. Azrak-Hamway Int'l, Inc.*, 668 F.2d 699 (2d Cir. 1982).  *Knickerbocker* involved a

6  copyright claim the defendant had used a copyrighted photograph in connection with its packaging

7  (i.e., a "blister" card), but because there was no evidence that packaging was used in the market "the

8  copyright claim with respect to the blister card falls squarely within the principle of *de minimis no*

9  *curat lex*, and dismissal of that claim is affirmed."  *Id.* at 703.

10  **B.      Plaintiff Fails to Show a Likelihood of Irreparable Harm Absent an Injunction**

11  BNEA is not entitled to a preliminary injunction because it has not shown that it is likely to

12  suffer irreparable harm as a result of AtGames' alleged use of Ms. Pac-Man IP.  *See ArcSoft, Inc. v.*

13  *CyberLink Corp.,* 153 F. Supp. 3d 1057, 1070-1071 (N.D. Cal. 2015) *citing Williams v. Green Valley*

14  *RV, Inc.*, No. 15-cv-01010, 2015 U.S. Dist. LEXIS 103409, 2015 WL 4694075, at *2 (C.D. Cal. Aug.

15  6, 2015).  AtGames is not advertising, making, selling, or offering to sell any products that include

16  Ms. Pac-Man and has never sold a product.  Hsiung Decl., ¶4.  Thus, contrary to BNEA's allegations

17  (Mot. at p. 12) there can be no immediate threat of irreparable harm.  *See Caribbean Marine*, 844 F.2d

18  at 674 (The threat of irreparable harm must be "immediate").  AtGames does not intend, and never

19  intended, to make any commercial product without a license from BNEA.  Hsiung Decl., ¶5.

20  The Ninth Circuit requires actual evidence of likelihood of irreparable harm along with proof

21  that "legal remedies, such as monetary damages, are inadequate."  *Herb Reed Enterprises, LLC v.*

22  *Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *Alto Velo Racing Club v. Rouleur*

23  *Sports Grp., LLC*, No. 5:15-cv-02144-PSG, 2015 WL 5462055, *7 (N.D. Cal. Sept. 17, 2015).

24  BNEA has not shown that irreparable harm is "likely."  And, "[s]peculative injury cannot be the

25  basis for a finding of irreparable harm."  *Solidus Networks, Inc. v. Excel Innovations, Inc.*, 502 F.3d

26  1086, 1098 (9th Cir. 2007).  For example, in *Herb Reed*, the Ninth Circuit reversing the district court,

27  found the district court had "abused its discretion by relying on unsupported and conclusory statements

28  regarding harm [the plaintiff] *might* suffer."  736 F.3d at 1249-50 (emphasis in original).  BNEA's

**OPPOSITION TO TRO AND MOTION FOR PRELIMINARY INJUNCTION**
**Case No. 3:19-cv-05898-VC**

showing of alleged irreparable harm vis-à-vis Ms. Pac-Man consists of: (1) its conclusory argument that "BNEA has already suffered significant reputational harm," and (2) its misleading reference to supposed product issues concerning the **unrelated** mark and IP for Pac-Man.  Mot. at 11; *see* Declaration of Jodie Lee in support of Defendant's Opposition ("Lee Decl."), ¶¶3-11.  Indeed, there is absolutely no evidence in the record concerning irreparable harm to the Ms. Pac-Man IP at issue in this Motion.  Besides being irrelevant to this Motion, the cited Pac-Man-related "evidence" is not indicative of any damage to BNEA's reputation, and if there was any damage or issue with the Pac-Man Products, it is of BNEA's own making.  *See* Lee Decl., ¶¶4-11.  Thus, there has been no proof of irreparable harm.  *See Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc*, No. 12-cv-03856 PJH, 014 WL 4312021, *11-13 (N.D. Cal. Aug. 28, 2014) (finding no irreparable harm where, "[plaintiff] has not shown any connection between that lost business and defendants' use of the [allegedly infringing mark]").

In an effort to manufacture an irreparable harm argument, BNEA cites to the Lundell Declaration.  Mot. at p. 12.  Despite knowing AtGames has not sold any unlicensed product, BNEA argues hypothetically that "entry into the market of an unlicensed product using Ms. PAC.-MAN Property,…, creates an unbearable risk to BNEA's goodwill and reputation in the industry."  Mot. at 12.  But, the mere prospect of the loss of reputation is not sufficient to establish a likelihood of irreparable harm.  *Wells Fargo*, 2014 WL 4312021, at *9.  And, BNEA's (and Lundell's) evidence of alleged past harm based on different marks and products (Pac-Man) is inadmissible, irrelevant and definitely not sufficient to show damage to BNEA's reputation based on use of Ms. Pac-Man.[2]  And,

---

[2] AtGames objects the portions of the Lundell Declaration (*i.e.*, paragraphs 10-19 and exhibits C-I) and the Pshihoules Declaration (the entirety) thereof insofar as they refer to and attach various internet postings.  Such evidence constitutes hearsay under Rule 801 of the Federal Rules of Evidence because the postings, and the declarants' supposed summaries thereof, are out of court statements offered for the truth of the matter asserted therein.  Specifically, these posting purport to be evidence that AtGames' Pac-Man product is poorly made and/or has a bad reputation, and BNEA offers them for that purpose.

AtGames further objects to the portion of the Lundell Declaration (*i.e.* paragraphs 22 and 23and exhibits K and L), the Irie Declaration (i.e., paragraph 3 and Exhibit A), and the Windham Declaration (i.e., paragraphs 4, 18 and Exhibit A) the purport to recount AtGames' conversations with retailers such as Gamestop.  The declarants were not parties to those conversations, therefore they lack personal knowledge (Fed. R. Evid. 602), and to the extent they are relying on emails from non-declarants that describe other statements supposedly made by AtGames outside of court they are

1  the Pac-Man products were lucrative for AtGames and BNEA.  *See* Hsiung Decl., ¶3; Lee Decl., ¶12.

2        As the Ninth Circuit recognized in *Herb Reed* "[e]vidence of loss of control over business

3  reputation and damage to goodwill could constitute irreparable harm" but such harm must be

4  established by specifically relevant evidence, not by "platitudes" or evidence that merely "underscores

5  customer confusion."  736 F.3d 1239 at 1250.  BNEA provides misleading allegations from Lundell

6  over its alleged damage to its reputation.  *See* Lee Decl., ¶¶4-11.

7        Finally, any hypothetical harm to BNEA can readily be addressed by monetary damages.

8  BNEA has a long history of licensing its games and their related rights for a stream of royalty

9  payments (in fact, it has done so with AtGames with respect to Pac-Man).  Hsiung Decl., ¶3; Lee

10  Decl., ¶12.  Indeed, BNEA has a long history of receiving royalties with respect to Ms. Pac-Man--a

11  factor that, while not alone dispositive, weighs against granting an injunction.  *See ActiveVideo*

12  *Networks, Inc. v. Verizon Communications, Inc.*, 694 F.3d 1312, 1339-1340 (Fed. Cir. 2012) (vacating

13  injunction; "In light of the record evidence including [plaintiff's] past licensing of this technology and

14  its pursuit of [defendant] as a licensee, no fact finder could reasonably conclude that [plaintiff] would

15  be irreparably harmed by the payment of a royalty (a licensing fee).")  In the unlikely event AtGames'

16  prototypes (*i.e.,* the only existing, allegedly infringing products) are somehow monetized, AtGames

17  can and would pay a royalty to BNEA.  And while there is no evidence AtGames is selling or making

18  any other Ms. Pac-Man products--and the evidence shows that it is not doing so--AtGames would

19  expect to pay a royalty to BNEA.  Thus, there is no reason any hypothetical harm to BNEA could not

20  be redressed through monetary damages rather than equitable relief.  *See Evolv, LLC v. Joyetech USA,*

21  *Inc.*, No. 16-459, 2016 WL 7507761, *7 (C.D. Cal. May 3, 2016) (finding that plaintiff failed to

22  _____

multiple layers of hearsay under Rule 801.

23        AtGames further objects Paragraph 2 of the Hokari Declaration, as it purports to recount
statements by an unidentified "counterpart at a BNEA affiliate" to the effect that an unidentified

24  "employee of one of the affiliates licensees" had been told by an unidentified "employee of AtGames
Holdings Ltd., or one of its affiliates" that AtGames was acquiring rights to Ms. Pac-Man.  This

25  evidence contains multiple layers of hearsay and is outside of Mr. Hokari's personal knowledge.

26        AtGames further objects to the portion of the Lundell Declaration  (*i.e.* paragraphs 21 and 24)
in which he offers opinion evidence that AtGames' alleged use of the Ms. Pac-Man IP is "confusingly

27  similar to" BNEA's IP, as Mr. Lundell does not purport to be an expert and he has not identified any
methodology (much less one that complies with applicable legal standards) by which he reached his

28  opinion.

**OPPOSITION TO TRO AND MOTION FOR PRELIMINARY INJUNCTION**
**Case No. 3:19-cv-05898-VC**

1   "persuasively assert that injunctive relief--rather than the availability of a future monetary award--is

2   necessary to prevent irreparable harm when all it collects from its patents on a regular basis is a

3   monetary royalty"); *see Rent-A-Ctr*, 944 F.2d at 603; *see also Wells Fargo*, 2014 WL 4312021, at *13

4   ("[plaintiff] has not shown that such harm could not be remedied through monetary damages.").

5           **C.      The Balance of Equities Weigh Against an Injunction**

6           "In evaluating the balance of hardships a court must consider the impact granting or denying a

7   motion for a preliminary injunction will have on the respective enterprises." *Cutting Edge Solutions,*

8   *LLC v. Sustainable Low Maint. Grass, LLC,* 2014 WL 5361548, at *13 (N.D. Cal. Oct. 20, 2014)

9   (citations omitted).  BNEA has made serious, but unfounded, allegations against AtGames.  AtGames

10  is not advertising, making, selling, or offering for sale any products containing Ms. Pac-Man.  Hsiung

11  Decl., ¶4; Zhang Decl., Ex. E.  And, AtGames has confirmed it will not advertise, make, sell or offer

12  for sell any products containing Ms. Pac-Man without a license to do so.  Hsiung Decl., ¶5; Zhang

13  Decl., Ex. E.  Thus, there is no activity to enjoin and a preliminary injunction would serve no purpose.

14          Before a preliminary injunction may issue, the court must identify the harm that a preliminary

15  injunction might cause the defendant and weigh it against plaintiff's threatened injury. "[T]he real

16  issue in this regard is the degree of harm that will be suffered by the plaintiff or the defendant if the

17  injunction is improperly granted or denied." *Scotts Co. v. United Industries Corp*., 315 F.3d 264, 284

18  (4th Cir. 2002).  Because AtGames would face irreparable harm if the Court grants BNEA's motion,

19  the Court should minimize the harm against AtGames in this case by denying a preliminary injunction.

20          Instead, it is clear from BNEA's allegations and this Motion, BNEA seeks to harm AtGames.

21  Indeed, AtGames believes these allegations are in retaliation of its purchase of GCC's royalty rights.

22  Hsiung Decl., ¶¶23-24; Zhang Decl., Ex. A.  BNEA's Complaint has already hit the media and has

23  resulted in negative publicity.  Hsiung Decl., ¶25.  BNEA is seeking to punish AtGames for entering

24  into a contract with GCC that BNEA had hoped to secure for itself.  BNEA's counsel admitted as

25  much when it wrote to AtGames counsel.  Zhang Decl., Ex. A.  But, when a party requests equitable

26  relief, they must not have unclean hands.  In the words of the old axiom: "he who seeks equity must

27  do equity." *In re Mortgage Elec. Registration Systems (MERS) Litigation*, No. CV-10-630-PHX-JAT,

28  2010 WL 11475611, *3 (D. Ariz. Jun. 11, 2010); *Silvas v. G.E. Money Bank*, 449 Fed. Appx. 641, 644

- 14 -

1    (9th Cir. 2011) (affirming denial of preliminary injunction based on doctrine of unclean hands).

2         Here, if this court were to grant a preliminary injunction, it would have a chilling effect on

3    AtGames' reputation and goodwill and other business and condone BNEA's harmful retaliation

4    against AtGames.  Hsiung Decl., ¶25.  Injury to defendant's goodwill is an important factor for the

5    denial of a preliminary injunction.  *See Galaxy Chemical Co. v. BASF Corp*., 11 U.S.P.Q.2d 1279

6    (N.D. Ill. 1989) ("Skepticism would develop in the marketplace. [Defendant's customers] would no

7    doubt become more concerned about [defendant's] products. The resultant consumer concern would

8    no doubt cause damage to the sales of [defendant's other products] … The goodwill lost as a result of

9    the erosion of consumer confidence and trust in [defendant's] products would be substantial and

10   cannot be adequately measured in monetary terms.")

11        Indeed, AtGames' customers, *i.e*., retailers such as Walmart and GameStop, have purchased

12   and do purchase many other products sold by AtGames, including have purchased AtGames' products

13   licensed by BNEA in 2016 and 2018 pursuant to those license agreements.  Hsiung Decl., ¶¶2-3.  If

14   the Court grants plaintiff's request for a preliminary injunction, the negative impact to AtGames'

15   goodwill and reputation would be severe and irreparable.  Indeed, retailers may assume that since the

16   Court granted the injunction, the allegations in the Complaint are true.  Moreover, AtGames'

17   customers might begin questioning whether other products sold by AtGames are enjoined or infringe

18   IP rights of third parties.  The substantial goodwill AtGames has built over the last 18 years in gaming

19   industry will be diminished.  Hsiung Decl., ¶15.  AtGames' reputation in the industry will be

20   downgraded from a respected supplier to retailers to an IP infringer.  Undoubtedly, AtGames will be

21   irreparably harmed and AtGames's harm substantially outweighs any purported harm to BNEA.

22        **D.     An Injunction Would Not Serve the Public Interest**

23        The public interest is not served by BNEA's effort to enjoin AtGames from doing activities

24   which AtGames is not doing, and which have--and have had--no impact on the public.

25   **V.    CONCLUSION**

26        For the foregoing reasons, and those to be offered at the hearing, BNEA's request for a

27   preliminary injunction should be denied.

28

- 15 -

1    DATED:  November 12, 2019              Respectfully submitted,

2

3                                          **DENTONS US LLP**

4                                          By: _/s/ Jennifer D. Bennett_____

5                                          Jennifer D. Bennett
                                           Jennifer.Bennett@dentons.com
6                                          Jinshu "John" Zhang
                                           John.Zhang@dentons.com
7
                                           *Attorneys for Defendant*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO TRO AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:19-cv-05898-VC

1

**CERTIFICATE OF SERVICE**

2

I, Jennifer Bennett, hereby declare:

3

I am employed in the City and County of San Francisco, California in the office of a member

4

of the bar of this court whose direction the following service was made.  I am over the age of eighteen

5

years and not a party to the within action.  My business address is Dentons US LLP, One Market

6

Plaza, Spear Tower, 24th Floor, San Francisco, California  94105.

7

On November 27, 2019, the following documents, described as:

8
9
10

**DEFENDANT ATGAMES HOLDINGS, LTD.'S CORRECTED OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE GRANTED (Dkt No. 14)**

11

to be served via CM/ECF by the Clerk of the Court, upon all counsel of record registered to receive

12

electronic filing, as indicated on the Court's website, or by United States Mail, upon those parties not

13

registered for electronic filing.

14

I declare under penalty of perjury that the above is true and correct.  Executed on

15

November 27, 2019, in San Francisco, California.

16

17

_____/s/ *Jennifer D. Bennett*_____
                              Jennifer D. Bennett

18

19

20

21

22

23

24

25

26

27

28