Jinshu "John" Zhang (Bar No. 166981)
John.Zhang@dentons.com
DENTONS US LLP
601 S. Figueroa Street
Suite 2500
Los Angeles, California 90017-5704
Tel: 213-623-9300

Jennifer D. Bennett (Bar No. 235196)
Jennifer.Bennett@dentons.com
DENTONS US LLP
One Market Plaza, Spear Tower, 24th Floor
San Francisco, California 94105
Tel: 415-267-4000

*Attorneys for Defendant AtGames Holdings, Ltd.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| BANDAI NAMCO ENTERTAINMENT AMERICA INC.<br><br>Plaintiff,<br><br>vs.<br><br>ATGAMES HOLDINGS, LTD.; and DOES 1 through 50,<br><br>Defendants. | **Case No.: 3:19-cv-05898-VC**<br><br>**DECLARATION OF DR. PING-KANG HSIUNG IN SUPPORT OF DEFENDANT ATGAMES HOLDINGS, LTD.'S OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE GRANTED (Dkt No. 14)** |

**DECLARATION OF DR. PING-KANG HSIUNG**

I, Dr. Ping-Kang ("PK") Hsiung, declare as follows:

1.  I am Chief Executive Officer of Defendant AtGames Holdings, Ltd. ("AtGames"). I make this declaration in support of Defendant's Opposition to Plaintiff's *ex parte* Application for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Be Granted. I have personal knowledge of the following facts, and if called as a witness, I could and would testify competently to those facts.

2.  I founded AtGames in 2001. AtGames is a global player in digital media and information technology with a unique focus on interactive entertainment. Over the years, our achievements have spanned retail products, digital distribution, streaming technology, and more. We have been very successful in bringing back to gamers many beloved classic video games including those previously released by Atari such as Asteroids, Missile Command, Pong, and Breakout, Activision's Pitfall, River Raid, Kaboom!, Disney's Lion King, Aladdin, Star Wars, and Bandai Namco Entertainment America's ("BNEA") Pac-Man, Galaga and Dig Dug. Our gaming products including Atari Flashback are sold through the nation's largest retailers including Walmart, GameStop, Target, Walgreens, Dollar General, and Bed Bath and Beyond.

3.  AtGames' release of classic BNEA video games, pursuant to license agreements with BNEA, has been very lucrative for both AtGames and BNEA. We pay BNEA royalty revenue tied into our thriving business and we provide "low risk" to BNEA by giving them certain pre-agreed guaranteed royalty revenue as well as to make an advance payment even before we start selling our licensed products. AtGames has entered into multiple licensing agreements with BNEA for video games including Pac-Man for use in AtGames' products, in October 2016 and July 2018. These licenses made AtGames and BNEA significant amounts of money.

4.  AtGames is not currently marketing, advertising, distributing, offering to sell, or selling any product, packaging, or any other item of any kind that uses, includes, or incorporates Ms. Pac-Man. Indeed, AtGames has never sold a Ms. Pac-Man home arcade, HDMI dongle, or

1  any other home entertainment device with Ms. Pac-Man. I understand this has been
2  communicated to BNEA repeatedly.

3       5. AtGames has, however, desired and continues to desire a license to Ms. Pac-Man
4  from BNEA so that it can make a Ms. Pac-Man home arcade and other home entertainment
5  devices. I understand AtGames cannot sell such a Ms. Pac-Man product without a license from
6  BNEA and does not intend to sell a Ms. Pac-Man product without a license from BNEA.

7       6. Throughout 2018 and 2019, AtGames was in serious and advanced business
8  discussions with BNEA regarding AtGames' development of gaming products with Ms. Pac-
9  Man. Throughout these business discussions, as common in the industry, AtGames was
10 transparent with BNEA as to the gaming products that AtGames wanted to develop, was
11 transparent that AtGames was talking to retailers and sent to BNEA an image of a potential
12 AtGames Ms. Pac-Man product at the retail shelf. *See* **Exhibit 1**, a true and correct copy of an
13 email string between March 23, 2018 through May 1, 2018 between AtGames and BNEA
14 representatives, Shoya Yamazaki and Kyoko Acheson, regarding Blast! Proposal Materials; and
15 **Exhibit 2**, a true and correct copy of an image attached to the April 20, 2018 11:12 a.m. email
16 from Sherry Hsu to Shoya Yamazaki and Kyoko Acheson of BNEA. AtGames' discussions with
17 BNEA for AtGames' development of Ms. Pac-Man products were very far along. In May 2018,
18 BNEA confirmed AtGames could release a HDMI Dongle with Ms. Pac-Man. *See* **Exhibit 1**,
19 May 1, 2018, 12:44 p.m. email from Shoya Yamazaki ("I've gotten the final confirmation from
20 JP team on releasing SKU A for this holiday and SKU B [Ms. Pac-Man] early next year. Next
21 Step is fixing 12 IPs for SKU A, and confirm the royalty for SKU B [Ms. Pac-Man]." And, on
22 August 28, 2018, AtGames' Sherry Hsu sent Shoya Yamazaki and Kyoko Acheson of BNEA an
23 AtGames home arcade mock-up product sheet. *See* August 28, 2018 email from Sherry Hsu to
24 Shoya Yamazaki and Kyoko Acheson regarding Ultimate Home Arcade and AtGames 2018
25 Home Arcade (May 31 2018) Product Sheet attachment, true and correct copies attached as
26 **Exhibit 3** ("Option 1- Pac-Man or Ms. Pac-Man (no pressure ☺)").

27      7. During our continued business discussions, on October 15, 2018, I emailed Shoya
28 Yamazaki and Kyoko Acheson of BNEA, informing BNEA that if the Ms. Pac-Man license was

approved quickly, we could "share the good news with Walmart in our meeting with them Friday." *See* October 15, 2018, 12:27 a.m., email from myself to Shoya Yamazaki and Kyoko Acheson of BNEA, a true and correct copy of the email string regarding AtGames: The initial proposal for Ms. PAC-MAN and attachments, are attached as **Exhibit 4**. Throughout or business discussions BNEA understood that Walmart and GameStop were interested in AtGames' potential Ms. Pac-Man products and AtGames was communicating with retailers. Indeed, Mr. Yamazaki of BNEA wrote in an email to AtGames, dated April 24, 2018, "Regarding the distribution in US, I assume AtGames has direct accounts with most of main retailers such as Game Stop, Walmart" and "This is crazy idea, but as a compromise plan, will there be any way to involve BANDAI in your product distribution? *I assume you would start discussion with retailers other than Walmart,* will there be any chances for BANDAI to be distribution partner of AtGames, so BANDAI can earn some money out of your products." *See* **Exhibit 1,** April 24, 2018, 10:54 a.m. and April 20, 2018, 4:41 p.m. emails from Shoya Yamazaki, respectively.

8. I did not tell anyone at Walmart that AtGames had a license to Ms. Pac-Man. I have also never told anyone at GameStop or any other retailer that AtGames has a license to Ms. Pac-Man. Indeed, I have only ever said that AtGames was trying to obtain and would like to obtain a license to Ms. Pac-Man from BNEA. This remains true today. In our industry, it is common practice to discuss with retailers potential opportunities, seek their feedback about interest and estimate quantity and marketing support. It's also industry practice that based on the key retailers' feedback, such as Walmart and GameStop, suppliers then provide a royalty estimate in their proposals to IP owners such as, in BNEA's Merchandise License Proposal Worksheet.

9. On October 15, 2018, I received a response from Mr. Yamazaki of BNEA thanking me for our proposal. *See* **Exhibit 4.** He responded "we're ok with releasing Ms. PAC-MAN blast [the HDMI Dongle] regarding Home Arcade, we need to discuss with our JP headquarter, and BANDAI NAMCO Amusement America… The reason being, there would be another royalty to 3rd party for Ms. PAC-MAN, and with that, Ms. PAC-MAN cannot be mixed up with our other IPs. (If we mix up Ms. PAC-MAN with other IPs, we have to pay 3rd party royalties for all IPs included)." I understood this to be a written approval for the Ms. Pac-Man

HDMI Dongle (referred to as the Ms. Pac-Man blast in his email). He also asked "if you have to separate the agreements, how much MG amount for each product would be." I understood this to be a request to re-submit two separate proposals, one for the HDMI Dongle and one for the Home Arcade. *See* **Exhibit 4**. I understood this email to mean that BNEA was "ok" to license Ms. Pac-Man to AtGames for the HDMI Dongle but needed more time before BNEA would license Ms. Pac-Man for the home arcade.

10. On October 16, 2018, 10:55 a.m., I sent an email to Shoya Yamazaki of BNEA attaching, as he requested, separate proposals to cover the HDMI Dongle and home arcade. *See* **Exhibit 4**. I sent the two proposals on BNEA's template form which I understand is used by BNEA for these types of requests. *Id.* The template BNEA proposal form requests potential royalty forecasts. As evidenced by BNEA's own template Merchandise License Proposal Worksheet, in our industry it is customary to ascertain retailers' interest and then provide potential forecasts to the intellectual property ("IP") owners so they can ascertain whether to grant a license or not. BNEA's Merchandise License Proposal Worksheet requests this information "in order for BNEA to evaluate your request." One of the other requested categories of information in BNEA's template form was a description of the proposed distribution channel(s) for the goods and specifically requests a list of possible retailers. Among others, AtGames identified Walmart and GameStop, as possible retailers. *Id.*

11. Since October 2018, AtGames understood it had BNEA's approval for its Ms. Pac-Man HDMI Dongle but that specific approval for the home arcade would take more time given a third-party issue. *See e.g.,* **Exhibit 4**, October 15th email from Mr. Yamazaki; and **Exhibit 5**, a true and correct copy of a July 30, 2019 email from Shuhei Hokari to myself regarding Planning for 2020. I also understood AtGames could discuss the Ms. Pac-Man Dongle with retailers. As recent as July 30, 2019, Mr. Hokari from BNEA wrote, "We just would like to confirm with you that we are all on the same page to treat this MsPAC-MAN matter carefully. Please don't get us wrong, we were also a bit surprised to hear it from our partner and our intention here is to have same understanding toward this matter. *[W]e are working hard to solve the situation for*

1  *MsPAC-MAN so hopefully we can come back to you before end of the year.*" *See* **Exhibit 5**, July 30, 2019, 2:56 p.m., email from Mr. Hokari.

12. The "product concept" brochures, attached to the Peake Declaration as exhibits B (dated November 2018) and D (dated January 2019), were made after AtGames obtained an "ok" from Mr. Yamazaki in October 2018 for the Ms. Pac-Man Dongle. *See* **Exhibit 4**; Dkt Nos. 14-32; 14-34. These were internal "product concept" brochures which depicted how AtGames might market a Ms. Pac-Man product if it obtained the license from BNEA. The conceptual brochures were designed for internal use, although sent confidentially to its sales representative, Peake Marketing, almost a year ago. The conceptual brochures have not been displayed to the public, nor are there any plans for them to be displayed to the public. In fact, the conceptual Ms. Pac-Man Dongle product in the conceptual brochures was never even made

13. In our industry, it is also common practice to make concept work and mock-ups for discussion with retailers and receiving feedback, while highlighting that IP rights belong to IP owners. AtGames has shared such confidential mockups with BNEA. *See* **Exhibits 1-2**, April 16, 2018 email from Sherry Hsu to BNEA's Shoya Yamazaki and Kyoko Acheson regarding Blast! Proposal Materials ("To help JP team visualize it, our designer has put together quickly a rendering to show your IP at Walmart stores. This is confidential and for mockup purpose, please do not distribute or reproduce to any third party. Thanks."). In accord with industry practice, AtGames in the last decade has made mock-up prototypes that were never shown, displayed, marketed, advertised, offered for sale or sold to the public.

14. Through online research, I learned about the development story of Ms. Pac-Man and that GCC, a group of MIT students, including, Steve Golson and Kevin Curran, had developed Ms. Pac-Man in the 1980s. I also learned through my research that GCC owned certain royalty rights in Ms. Pac-Man and that GCC had entered into an agreement with BNEA. I assumed then that the BNEA third party issue was likely with GCC.

15. After learning about GCC and its development of Ms. Pac-Man, I reached out to Steve Golson, who subsequently connected me to Kevin Curran, to seek support with a license to Ms. Pac-Man. Asking for support for our Ms. Pac-Man license was just one of the multiple

topics I explored with Steve Golson and Kevin Curran. My larger interest was to collaborate with GCC including, to create new games and to create education STEM products to teach young children and girls how to program. I also wanted to make their success story and legacy passed on to the gaming industry. They were interested in all of these topics.

16. In August 2019, I met with Kevin Curran in person to discuss our potential collaborations. I learned in that meeting that GCC only had a royalty sharing right, not the right to grant or block any license regarding Ms. PAC-MAN, and that BNEA had not told GCC about the pending requests to license Ms. Pac-Man from BNEA.

17. During our first face to face meeting, I told Kevin Curran about our pending offer to BNEA to license Ms. Pac-Man that would result in multiple million dollars of royalty revenue, and that there were other licensees making offers as we had been told by BNEA. Kevin Curran told me he was surprised to learn that as he had not known such offers existed. I learned from Kevin Curran that BNEA had offered to buy GCC's rights and Kevin Curran was not happy about the low offer from BNEA and BNEA did not tell GCC about the pending requests. After hearing this, Kevin Curran wanted to know my opinion about the market value of GCC's rights. I told him what I thought the fair market value would be $10 million or more. At that time, I was not thinking about buying GCC's rights for AtGames, and he made it explicitly clear that he wasn't thinking of selling it to AtGames. I was just answering his question as to what I thought the fair market value was for their rights.

18. After our in-person meetings about broader long-term collaboration between AtGames and GCC, in connection with wanting Kevin Curran's support in getting our license from BNEA, AtGames made one Ms. Pac-Man arcade prototype and shipped it to Kevin Curran. AtGames and GCC also entered into a licensing support agreement on August 16, 2019, a copy of which is attached hereto as **Exhibit 6**. As set forth in the support agreement, AtGames agreed to pay a 5% royalty directly to GCC so that BNEA could keep AtGames' royalty payment completely for itself and would not need to share any of its royalty from AtGames with GCC. *See* **Exhibit 6**, ¶¶3-4. Thus, AtGames was agreeing to pay "on top of" its royalty payment to

BNEA, a royalty payment to GCC, such that BNEA could make more money. *Id.* I thought that by AtGames' agreement to pay an extra piece of royalty to GCC that BNEA would be happy. I had previously mentioned this type of arrangement to Shuhei Hokari of BNEA. *See e.g.,* **Exhibit 5,** July 30, 2019, 1:12 p.m., email from PK Hsiung to Hokari and Acheson of BNEA, re: 2020 Planning ("4.    For our categories our intention/interest remains unchanged that we pay GCC a separate royalty in addition to our direct royalty to Bandai Namco.")  I had been proposing to BNEA since approximately September 2018 to pay extra on top of AtGames' royalty to BNEA to cover the said third party.  So, when I met Kevin Curran, I mentioned to him that I had made such an offer to BNEA and he said he would be willing to confirm a direct deal with GCC taking the "extra" royalty from BNEA.

19.    I sent to Kevin Curran of GCC the prototype of the Ms. Pac-Man home arcade so he could see how cool the prototype was and to help AtGames persuade BNEA to grant a Ms. Pac-Man license to AtGames.  I sent the prototype to him as one of the inventors of Ms. Pac-Man and as an owner of royalty rights in Ms. Pac-Man, not as a member of the public or a potential customer, distributor, seller, *etc*. of the product.  I understood that at the time I sent the prototype to Kevin Curran, that he was aware AtGames did not have a license to Ms. Pac-Man.  Indeed, I sought his support to obtain the rights from BNEA.  I never told Kevin Curran or anyone else, that AtGames had or has IP rights to Ms. Pac-Man.

20.    As I expected, Kevin Curran was excited about the prototype that AtGames sent and told me that he would support AtGames' efforts to get the product made.  We understood that in order to have the product made, AtGames would need to obtain a license from BNEA.  I understood that GCC did not have the right to grant a license to Ms. Pac-Man IP.  I didn't know at the time that because Kevin Curran was excited about the prototype, he took a picture of the prototype.  I understood later that the picture Mr. Curran took of the prototype ultimately became an exhibit to the Complaint.  I also understand that Mr. Curran still has the prototype in his possession.

21.    AtGames built two additional prototypes for AtGames' internal testing/study and to later send to BNEA for their feedback and approval.  These two prototypes are still at AtGames

1  and are not being shown or displayed to the public.  The three prototypes are the only Ms. Pac-
2  Man prototypes AtGames has made.  The AtGames Ms. Pac-Man mock-up prototypes were never
3  shown, displayed, marketed, advertised, offered for sale or sold to the public.

4      22.     It was not until August 21, 2019, after BNEA learned I spoke to GCC, that
5  suddenly BNEA told AtGames it would not license Ms. Pac-Man to AtGames.  *See* Aug. 21,
6  2019 email from Shoya Yamazaki of BNEA to myself, cc'ing BNEA's lawyer Mr. Patrick
7  Lundell, a true and correct copy of the email is attached as **Exhibit 7**.  By this time, AtGames and
8  BNEA had been discussing the launch of AtGames' Ms. Pac-Man products for over a year,
9  AtGames had already received approval for a Ms. PacMan HDMI dongle product and AtGames
10 had submitted merchandise license proposals for an HDMI dongle and a home arcade.

11     23.     After learning that AtGames had talked to GCC, on August 22, 2019, Patrick
12 Lundell of BNEA threatened me to back off from contacting GCC or he would terminate our
13 agreements for Pac-Man.  *See* August 22 email from myself to Patrick Lundell memorializing our
14 phone call, a true and correct copy attached as **Exhibit 8** ("I received your call that you demand
15 us to withdraw our offer to Kevin by the end of today or else you will terminate our existing
16 agreement on next Monday. And we will be completely off the licensee list for Ms. Pac-Man as a
17 direct consequence of our approaching GCC and not related to the 2018 media problem.")  This
18 was very upsetting to me and I learned from Kevin Curran, was also upsetting to GCC.  It was
19 only after Mr. Lundell told me not to talk to GCC and threatened to terminate our agreements for
20 Pac-Man that GCC and AtGames discussed AtGames buying GCC's royalty rights.  On August
21 24, 2019, AtGames acquired all of the royalty rights of GCC with respect to Ms. Pac-Man under
22 the agreements between GCC and BNEA.

23     24.     I was upset that on August 27, 2019, without any reason to do so, BNEA sent a
24 notice to terminate the 2016 and 2018 agreements.  I believe the only reason BNEA wanted to
25 terminate the 2016 and 2018 license agreements with AtGames is because BNEA wanted to buy
26 GCC's royalty rights for itself.  I believe that BNEA has retaliated against AtGames for
27 purchasing GCC's royalty rights in Ms. Pac-Man.  I do not believe BNEA's claims that it has
28 terminated the Pac-Man license agreements due to alleged issues with AtGames' Pac-Man

1  products from 2018.  Very recently, before learning of the AtGames' communications with GCC,
2  AtGames was working with BNEA to prepare for the 40th anniversary of Pac-Man.  *See e.g.,*
3  **Exhibit 5,** July 22, 2019 email from Shuhei Hokari to myself and Janice Ross of AtGames
4  regarding 2020 Planning ("The topic we would like to discuss would be the products plan for
5  2020 which is 40th anniversary of PAC-MAN.")  And, I understand Ms. Lee, the Chief Executive
6  Officer of AtGames, clarifies the alleged issues with the Pac-Man products in her declaration in
7  support of Defendant's Opposition to Plaintiff's *ex parte* Application for a Temporary
8  Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Be
9  Granted, so I will not repeat her statements here.

10  25.  After BNEA's Complaint against AtGames was filed, AtGames has received
11  negative publicity in the gaming community.  If BNEA were to get an injunction against
12  AtGames, it would hurt AtGames' reputation, which I have built over the last 18 years.
13  Additionally, BNEA's August 21, 2019 reversal of its approval for the Ms. Pac-Man HDMI
14  Dongle has damaged the good-will and trust AtGames has built with our retailer customers over
15  the years.  It was unprofessional and improper for BNEA to rescind its approval, which AtGames
16  and retailers had relied upon in making future planning, causing harm, at a minimum, to
17  AtGames' reputation and good-will.

18  26.  I would also like to clarify a misstatement from the Declaration of Shuhei Hokari
19  ("Hokari Decl.") regarding a conversation he and I had on July 30, 2019.  (Dkt No. 14-28).  In
20  paragraph 2 of his declaration, Mr. Hokari declares he had been told that AtGames was claiming
21  it had acquired rights to Ms. Pac-Man *from GCC*.  Hokari Decl.*,* ¶2.  Then, he declares in
22  paragraph 4 of his declaration, "during the July 30, 2019 call I briefly asked PK Hsiung if he
23  could confirm the information I had received from BNEA's affiliate, which he denied."  Hokari
24  Decl., ¶4.  During our phone call, Mr. Hokari never asked me whether AtGames had been telling
25  others that AtGames acquired a license for Ms. Pac-Man rights *from GCC*.  Instead, he asked me
26  during the call whether AtGames had been telling people that AtGames had received a license
27  *from Bandai Namco* for Ms. Pac-Man.  I told him during our call that "no" we were not telling
28  people AtGames had received a license from Bandai Namco for Ms. Pac-Man.  I then

memorialized a "Re-cap" of this call in an email to Mr. Hokari, which is attached to the Hokari Declaration as Exhibit A (Dkt No. 14-29). I wrote in my email to him, summarizing the call that, "we did not claim to be licensed by Bandai Namco for Ms. Pac-Man." Then, later by e-mail, he asked me to confirm whether "AtGames told them that have acquired licensed of Ms. PAC_MAN for both arcade and consumer from GCC." Hokari Decl., Ex. A. And, I correctly told him "no we didn't make such a claim." *Id.* Indeed, this would not make sense as I knew GCC did not own IP rights for Ms. Pac-Man, we did not have IP rights for Ms. Pac-Man from BNEA and AtGames would have to obtain those rights from BNEA, and I would not have discussed seeking help from GCC for our BNEA license with third parties, which is why I confirmed "no" and wrote, "You will be the first one we come to." *Id.* Also, note that the remainder of the email string (Hokari Exhibit A) between me and Mr. Hokari is attached as **Exhibit 5**. It is clear from his last email to me in this string that as recent as July 30, 2019, BNEA was working "hard" to get AtGames' Ms. Pac-Man products approved. *See* **Exhibit 5**, July 30, 2019 email from Shuhei Hokari ("we are working hard to solve the situation for MsPAC-MAN so hopefully we can come back to you before end of the year").

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration is executed on October 30, 2019, in El Segundo, California.

/s/ Dr. Ping-Kang Hsiung

**CERTIFICATE OF SERVICE**

I, Jennifer Bennett, hereby declare:

I am employed in the City and County of San Francisco, California in the office of a member of the bar of this court whose direction the following service was made. I am over the age of eighteen years and not a party to the within action. My business address is Dentons US LLP, One Market Plaza, Spear Tower, 24th Floor, San Francisco, California 94105.

On November 27, 2019, the following documents, described as:

**DECLARATION OF DR. PING-KANG HSIUNG IN SUPPORT OF DEFENDANT ATGAMES HOLDINGS, LTD.'S OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE GRANTED (Dkt No. 14)**

to be served via CM/ECF by the Clerk of the Court, upon all counsel of record registered to receive electronic filing, as indicated on the Court's website, or by United States Mail, upon those parties not registered for electronic filing.

I declare under penalty of perjury that the above is true and correct. Executed on November 27, 2019, in San Francisco, California.

/s/ *Jennifer D. Bennett*
Jennifer D. Bennett

- 12 -

DECLARATION OF DR. PING-KANG HSIUNG         Case No. 3:19-CV-05898-VC