Jennifer D. Bennett (SBN 235196)
jennifer.bennett@dentons.com
DENTONS US LLP
One Market Plaza
Spear Tower, 24th Floor
San Francisco, California  94105
Telephone:  (415) 267-4000

Jinshu Zhang (SBN 166981)
john.zhang@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles,  California 90017
Telephone:  (213) 623-9300

*Attorneys for Defendant*
ATGAMES HOLDINGS, LTD.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| BANDAI NAMCO ENTERTAINMENT AMERICA INC., | ) Case No.  3:19-cv-05898-VC |
| | ) |
| | ) **ANSWER TO FIRST AMENDED** |
| Plaintiff, | ) **COMPLAINT AND COUNTERCLAIMS** |
| | ) |
| vs. | ) |
| | ) |
| ATGAMES HOLDINGS, LTD.; and Does 1 through 50, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |
| ATGAMES HOLDINGS, LTD., | ) |
| | ) |
| Counterclaim-Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| BANDAI NAMCO ENTERTAINMENT AMERICA INC., | ) |
| | ) |
| Counterclaim-Defendant. | ) |
| | ) |

Defendant AtGames Holdings, Ltd. ("AtGames" or "Defendant") by and through the undersigned counsel, responds to Plaintiff BANDAI NAMCO Entertainment America Inc.'s ("BNEA" or "Plaintiff") First Amended Complaint ("FAC") as follows:

1.      AtGames admits that the FAC purports to seek injunctive relief, monetary damages and other relief.  AtGames further admits that the FAC contains purported causes of action for Trademark Infringement under the Lanham Act, Counterfeiting under the Lanham Act, Copyright Infringement under the Copyright Act, Unfair Competition and False Designation of Origin under the Lanham Act, False Advertising under the Lanham Act, California Unfair Competition, California False Advertising and Breach of Contract.  AtGames denies the remaining allegations in paragraph 1, including any allegation that AtGames has committed any wrongdoing, that AtGames is subject to liability for any of the above-referenced causes of action, and that Plaintiff is entitled to the relief it seeks by way of the FAC.

[2.][1]      AtGames denies the allegations of paragraph 2, except admits it entered into the Stipulation Consenting to Filing of Amended Complaint and Related Pleading Matters (Dkt No. 47) and agreed that BNEA shall "file its Amended Complaint prior to and in lieu of responding to AtGames' currently asserted Counterclaims…"

## PARTIES

2.      AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 2, and therefore denies such allegations.

3.      AtGames denies the allegations of paragraph 3, except it admits that: (i) it is a corporation formed under the laws of the British Virgin Islands, (ii) it has a place of business located in Taipei, Taiwan, and (iii) an office located in El Segundo, California.

4.      AtGames admits BNEA purports to bring a FAC against DOES 1 through 50. AtGames lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of paragraph 4, and therefore denies such allegations.

---

[1] BNEA has two paragraphs numbered 2 in its FAC. In order to keep with the numbered paragraphs from BNEA's FAC, AtGames has replicated BNEA's numbering.

ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS
Case No. 3:19-cv-05898-VC

5.      AtGames denies the allegations of paragraph 5.

## JURISDICTION AND VENUE

6.      AtGames denies the allegations of paragraph 6, except it admits this Court has subject matter jurisdiction over this action.

7.      AtGames denies the allegations of paragraph 7, except it admits that it is subject to personal jurisdiction within California.

8.      AtGames denies the allegations of paragraph 8, except it admits that it is subject to personal jurisdiction within California.

9.      AtGames denies the allegations of paragraph 9, except it admits that venue is proper in this Court for this dispute.

## INTRADISTRICT ASSIGNMENT

10.     AtGames denies the allegations of paragraph 10, except it admits the action has been assigned to the San Francisco Division and that maintaining this action in the San Francisco Division is proper.

## FACTUAL BACKGROUND[2]

### *BANDAI NAMCO and its Successful PAC-MAN Video Game*

11.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 11, and therefore denies such allegations.

12.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 12, and therefore denies such allegations.

13.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 13, and therefore denies such allegations.

14.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 14, and therefore denies such allegations.

---

[2] AtGames is replicating the headings in the Complaint for purposes of maintaining the organizational structure of the Complaint in its Answer.  Nothing herein shall be deemed an admission of the contents of any heading and, therefore, the truth of the content of such headings is denied.

ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS
Case No. 3:19-cv-05898-VC

15.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 15, and therefore denies such allegations.

### *The Development of Ms. PAC-MAN and Relationship between GCC and BANDAI NAMCO*

16.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 16, and therefore denies such allegations.

17.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 17, and therefore denies such allegations.

18.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 18, and therefore denies such allegations.

19.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 19, and therefore denies such allegations.

20.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 20, and therefore denies such allegations.

21.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 21, and therefore denies such allegations.

22.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 22, and therefore denies such allegations.

23.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 23, and therefore denies such allegations.

24.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 24, and therefore denies such allegations.

25.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 25, and therefore denies such allegations.

26.     AtGames denies that its "conduct" as referenced in paragraph 26 was improper in any way and lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of paragraph 26, and therefore denies such allegations.

### *Ms. PAC-MAN and the Ms. PAC-MAN Property*

27.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 27, and therefore denies such allegations.

28.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 28, and therefore denies such allegations.

29.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 29, and therefore denies such allegations.

30.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 30, and therefore denies such allegations, except it refers to U.S. Trademark Registration No. 1,279,066 for a true and complete statement of its contents.

31.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 31, and therefore denies such allegations, except it refers to U.S. Copyright Registration No. PA 140-275 for a true and complete statement of its contents.

32.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 32, and therefore denies such allegations, except it refers the U.S. Copyright Registrations referenced in paragraph 32 for a true and complete statement of their respective contents.

33.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 33, and therefore denies such allegations.

34.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 34, and therefore denies such allegations.

### *BNEA's Relationship with AtGames*

35.     AtGames denies the allegations of paragraph 35, except it admits that AtGames develops, manufactures and sells certain interactive entertainment products which contain certain licensed video games.

36.     AtGames denies the allegations of paragraph 35, except it admits that AtGames' CEO, Ping-Kang Hsiung contacted Plaintiff to discuss a potential license to use Bandai Namco's

ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS
Case No. 3:19-cv-05898-VC

intellectual property through various plug-and-play and handheld consoles.  AtGames denies the remaining allegations of this paragraph.

### *The BNEA-AtGames License Agreements*

37.     AtGames denies the allegations of paragraph 37, except admits that it has discussed and provided various licensing proposals to Plaintiff, some of which were approved by Plaintiff and others were not.

38.     AtGames denies the allegations of paragraph 38, except that it admits (i) AtGames and BNEA entered into a written License Agreement effective as of October 10, 2016 (the "2016 Agreement"); (ii) that pursuant to the 2016 Agreement, BNEA granted to AtGames a license to use the characters, designs, likeness, visual representations, copyrights, character names, trademarks and other rights owned or controlled by BNEA and its licensors incorporated in several identified video games, including Pac-Man, for use in its Atari Flashback Portable product and a Sega Genesis Ultimate Portable; and (iii) refers to the 2016 Agreement for a true and complete statement of its contents.

39.     AtGames denies the allegations of paragraph 39, except that it admits (i) AtGames submitted License Proposals for a Ms. Pac-Man Dongle and home arcade, and (ii) admits that it does not currently have a license from BNEA for Ms. Pac-Man.

40.     AtGames denies the allegations of paragraph 40, except that it refers to the emails referenced in paragraph 40 for a true and complete statement of their contents.

41.     AtGames denies the allegations of paragraph 41, except that it admits AtGames and BNEA entered into a written Merchandise Development & Distribution Agreement effective as of June 1, 2018 (the "2018 Agreement") and a First Amendment, dated August 1, 2018

42.     AtGames denies the allegations of paragraph 42, except that admits (i) BNEA granted to AtGames a license to develop, and distribute, certain interactive entertainment products containing copyrights, trademarks, trade secrets, industrial design rights, utility patents, rights to likeness, publicity or privacy and other similar intellectual property rights owned or controlled by BNEA, including with respect to any story line, environment, gameplay, game

features, characters, character names and titles, concepts, design elements, "look and feel," artwork, graphics, sound and music, literary, dramatic and any other content or material comprising, featured in, or relating to such interactive entertainment products and any part or element thereof--including any data, materials or content relating to or incorporated in same, including any trademark, trade name, service mark, logo, design, character or artwork owned by BNEA or its licensors, and any part or element thereof; (ii) admits Ms. Pac-Man was not among those products; and (iii) refers to the 2018 Agreement for a true and complete statement of its contents.

43.     AtGames denies the allegations of paragraph 43, except that it refers to the 2018 Agreement for a true and complete statement of its contents.

44.     AtGames denies the allegations of paragraph 44, except that it admits (i) AtGames successfully developed, marketed and sold an HDMI Dongle containing Pac-Man, (ii) admits AtGames fully performed all of its obligations under the 2016 and 2018 Agreements; and (iii) admits that AtGames has paid--and BNEA has accepted--all royalties owed for the HDMI Dongle containing Pac-Man.

### *AtGames' Unauthorized Ms. PAC-MAN Product*

45.     AtGames denies the allegations of paragraph 45, except that it admits (i) AtGames submitted License Proposals for a Ms. Pac-Man Dongle and home arcade; (ii) that it does not currently have a license from BNEA for Ms. Pac-Man; and (iii) refers to the License Proposals for a true and complete statement of their contents.

46.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 46, and therefore denies such allegations, except it refers to the October 15, 2018 email referenced in paragraph 46 for a true and complete statement of its contents.

47.     AtGames denies the allegations of paragraph 47, except it refers to the November 4, 2018 email referenced in paragraph 47 for a true and complete statement of its contents.

48.     AtGames denies the allegations of paragraph 48, except it refers to the November

ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS
Case No. 3:19-cv-05898-VC

16, 2018 and November 20, 2018 email referenced in paragraph 48 for a true and complete statement of their contents.

49.     AtGames denies the allegations of paragraph 49, except it refers to the December 13, 2018 email referenced in paragraph 49 for a true and complete statement of its contents.

50.     AtGames denies the allegations of paragraph 50, except it refers to the December 13, 2018 email referenced in paragraph 50 for a true and complete statement of its contents.

51.     AtGames denies the allegations of paragraph 51, except it refers to the March 22, 2019 and March 29, 2019 email referenced in paragraph 51 for a true and complete statement of their contents.

52.     AtGames denies the allegations of paragraph 52, except it refers to the June 26, 2019 email referenced in paragraph 52 for a true and complete statement of its contents.

53.     AtGames denies the allegations of paragraph 53.

54.     AtGames denies the allegations of paragraph 54, except: (i) it admits it has denied making any false statements, (ii) it admits it has discussed Ms. Pac-Man with Plaintiff on multiple occasions, (iii) it admits that it has never claimed to have a license from Bandai Namco regarding Ms. Pac-Man Products, and (iv) it refers to Exhibit 6 for a true and complete statement of its contents.

55.     AtGames denies the allegations of paragraph 55, except: (i) it admits that it has never claimed to have a license from Bandai Namco regarding Ms. Pac-Man Products, and (ii) it refers to Exhibit 6 for a true and complete statement of the contents of its contents.

56.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 56, and therefore denies such allegations, except: (i) it admits that it communicated with Mr. Curran about acquiring GCC's interest in Ms. Pac-Man; and (ii) it admits that it delivered a prototype of a Ms. Pac-Man product to Mr. Curran.

57.     AtGames denies the allegations of paragraph 57.

58.     AtGames denies the allegations of paragraph 58, except it admits that the image shown in Exhibit 5 contains depictions of artwork relating to Ms. Pac-Man.

ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS
Case No. 3:19-cv-05898-VC

59.     AtGames denies the allegations of paragraph 59, except it admits that it created a total of three prototypes for a Ms. Pac-Man product that contained Ms. Pac-Man software.

60.     AtGames denies the allegations of paragraph 60, except it admits that it created three prototypes for a Ms. Pac-Man product that contained Ms. Pac-Man software outside of the United States.

61.     AtGames denies the allegations of paragraph 61, except it admits that: (1) it created a total of three prototypes for a Ms. Pac-Man product that contained Ms. Pac-Man software, (2) one such prototype was sent to Mr. Curran, and (3) the delivery was made to Mr. Curran in a state other than California.

62.     AtGames denies the allegations of paragraph 62.

63.     AtGames denies the allegations of paragraph 63, except it admits that it has never entered into a license agreement with Plaintiff regarding Ms. Pac-Man.

64.     AtGames denies the allegations of paragraph 64.

65.     AtGames denies the allegations of paragraph 65.

66.     AtGames denies the allegations of paragraph 66.

67.     AtGames denies the allegations of paragraph 67.

68.     AtGames denies the allegations of paragraph 68.

69.     AtGames denies the allegations of paragraph 69.

70.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 70, and therefore denies such allegations, except it admits that it communicated with Mr. Curran about acquiring GCC's interest in Ms. Pac-Man.

71.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 71, and therefore denies such allegations.

72.     AtGames admits the allegations of paragraph 72, except it lacks knowledge or information sufficient to form a belief about the truth of the allegations concerning BNEA's attempts to verify AtGames' correspondence, and therefore denies such allegations.

73.     AtGames denies the allegations of paragraph 73.

ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS
Case No. 3:19-cv-05898-VC

74.     AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 74, and therefore denies such allegations, except it refers to Exhibit 7 for a true and complete statement of its contents.

75.     AtGames denies the allegations of paragraph 75, except it refers to Exhibit 7 for a true and complete statement of its contents.

76.     AtGames denies the allegations of paragraph 76, except it admits that it has never entered into a license agreement with Plaintiff regarding the Ms. Pac-Man video game.

77.     AtGames denies the allegations of paragraph 77, except it: (i) admits that it has engaged in preliminary discussions with certain retailers, including Walmart and Gamestop, about a potential Ms. Pac-Man game that AtGames could manufacture and sell only if it entered into a license agreement with Plaintiff regarding the Ms. Pac-Man video game; and (ii) admits that it does not currently have a license from BNEA for Ms. Pac-Man.

78.     AtGames denies the allegations of paragraph 78.

79.     AtGames denies the allegations of paragraph 79.

### _AtGames' Wrongful Conduct and Breaches of the License Agreements_

80.     AtGames denies the allegations of paragraph 80.

81.     AtGames denies the allegations of paragraph 81.

82.     AtGames denies the allegations of paragraph 82.

83.     AtGames denies the allegations of paragraph 83.

84.     AtGames denies the allegations of paragraph 84.

85.     AtGames denies the allegations of paragraph 85.

86.     AtGames denies the allegations of paragraph 86.

87.     AtGames denies the allegations of paragraph 87, except it admits that: (i) in 2018, AtGames distributed, with BNEA's permission and approval, certain Bandai Namco Flashback Blast! Products that included the Pac-Man video game; and (ii) in 2018, AtGames received positive press and reviews for the referenced Bandai Namco Flashback Blast! Products that included the Pac-Man video game.

88.     AtGames denies the allegations of paragraph 88.

89.     AtGames denies the allegations of paragraph 89.

90.     AtGames denies the allegations of paragraph 90.

91.     AtGames denies the allegations of paragraph 91.

92.     AtGames denies the allegations of paragraph 92, except that it refers to the 2016 Agreement for a true and complete statement of its contents.

93.     AtGames denies the allegations of paragraph 93.

94.     AtGames denies the allegations of paragraph 94, except that it admits pursuant to the 2018 Agreement it developed, marketed and sold an HDMI Dongle containing Pac-Man including, at Sam's Club.

95.     AtGames denies the allegations of paragraph 95.

96.     AtGames denies the allegations of paragraph 96.

97.     AtGames denies the allegations of paragraph 97.

98.     AtGames denies the allegations of paragraph 98.

99.     AtGames denies the allegations of paragraph 99.


## COUNT I

### Trademark Infringement under the Lanham Act
### (15 U.S.C. § 1114(1)(a))

100.    In response to paragraph 100, AtGames incorporates by reference its responses to paragraph 1-99, as if fully set forth herein.

101.    AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 101, and therefore denies such allegations.

102.    AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 102, and therefore denies such allegations.

103.    AtGames denies the allegations of paragraph 103.

104.    AtGames denies the allegations of paragraph 104.

105.    AtGames denies the allegations of paragraph 105.

106.    AtGames denies the allegations of paragraph 106.

107.    AtGames denies the allegations of paragraph 107.

108.    AtGames denies the allegations of paragraph 108.

## COUNT II

**Counterfeiting under the Lanham Act**
**(15 U.S.C. § 1114(1)(a) and § 1116(d))**

109.    In response to paragraph 109, AtGames incorporates by reference its responses to paragraph 1-108, as if fully set forth herein.

110.    AtGames denies the allegations of paragraph 110.

111.    AtGames denies the allegations of paragraph 111.

112.    AtGames denies the allegations of paragraph 112.

113.    AtGames denies the allegations of paragraph 113.

114.    AtGames denies the allegations of paragraph 114.

115.    AtGames denies the allegations of paragraph 115.

## COUNT III

**Copyright Infringement under the Copyright Act**
**(17 U.S.C. § 501(a))**

116.    In response to paragraph 116, AtGames incorporates by reference its responses to paragraph 1-115, as if fully set forth herein.

117.    AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 117, and therefore denies such allegations.

118.    AtGames lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 118, and therefore denies such allegations.

119.    AtGames denies the allegations of paragraph 119.

120.    AtGames denies the allegations of paragraph 120, except AtGames admits that it has not entered into a license agreement with Plaintiff pursuant to which AtGames was granted permission to use intellectual property owned by Plaintiff in connection with the Ms. Pac-Man

video game.

121.    AtGames denies the allegations of paragraph 121.

122.    AtGames denies the allegations of paragraph 122.

123.    AtGames denies the allegations of paragraph 123

124.    AtGames denies the allegations of paragraph 124.

## COUNT IV

**Unfair Competition and False Designation of Origin under the Lanham Act
(15 U.S.C. § 1125(a)(1)(A))**

125.    In response to paragraph 125, AtGames incorporates by reference its responses to paragraph 1-124, as if fully set forth herein.

126.    AtGames denies the allegations of paragraph 126.

127.    AtGames denies the allegations of paragraph 127.

128.    AtGames denies the allegations of paragraph 128.

129.    AtGames denies the allegations of paragraph 129.

## COUNT V

**False Advertising under the Lanham Act
(15 U.S.C. § 1125(a)(1)(B))**

130.    In response to paragraph 130, AtGames incorporates by reference its responses to paragraph 1-129, as if fully set forth herein.

131.    AtGames denies the allegations of paragraph 131.

132.    AtGames denies the allegations of paragraph 132.

133.    AtGames denies the allegations of paragraph 133.

134.    AtGames denies the allegations of paragraph 134.

135.    AtGames denies the allegations of paragraph 135.

136.    AtGames denies the allegations of paragraph 136.

ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS
Case No. 3:19-cv-05898-VC

## COUNT VI

**California Unfair Competition**
**(Cal. Bus. & Prof. Code Sections 17200 *et seq*.)**

137.     In response to paragraph 137, AtGames incorporates by reference its responses to paragraph 1-136, as if fully set forth herein.

138.     AtGames denies the allegations of paragraph 138, except it refers to Cal. Bus. & Prof. Code §§ 17200 *et seq.* for a true and complete statement of its contents.

139.     AtGames denies the allegations of paragraph 139.

140.     AtGames denies the allegations of paragraph 140.

141.     AtGames denies the allegations of paragraph 141.

142.     AtGames denies the allegations of paragraph 142.

143.     AtGames denies the allegations of paragraph 143.

144.     AtGames denies the allegations of paragraph 144.

## COUNT VII

**California False Advertising**
**(Cal. Bus. & Prof. Code Sections 17500 *et seq*.)**

145.     In response to paragraph 145, AtGames incorporates by reference its responses to paragraph 1-144, as if fully set forth herein.

146.     AtGames denies the allegations of paragraph 146, except it refers to Cal. Bus. & Prof. Code §§ 17200 *et seq.* for a true and complete statement of its contents

147.     AtGames denies the allegations of paragraph 147.

148.     AtGames denies the allegations of paragraph 148.

149.     AtGames denies the allegations of paragraph 149.

150.     AtGames denies the allegations of paragraph 150.

151.     AtGames denies the allegations of paragraph 151.

## COUNT VIII

**Breach of Contract**

152.    In response to paragraph 152, AtGames incorporates by reference its responses to paragraph 1-151, as if fully set forth herein.

153.    AtGames admits the allegations of paragraph 153.

154.    AtGames denies the allegations of paragraph 154, except that it admits AtGames successfully developed, marketed and sold an HDMI Dongle containing Pac-Man.

155.    AtGames admits pursuant to the License Agreements that it successfully developed, marketed and sold an HDMI Dongle containing Pac-Man and refers to the 2016 and 2018 Agreements for a true and complete statement of their contents.

156.    AtGames denies the allegations of paragraph 156.

157.    AtGames denies the allegations of paragraph 157.

158.    AtGames denies the allegations of paragraph 158.

159.    AtGames denies the allegations of paragraph 159.

## DEFENSES

Without assuming any burden of proof or persuasion which it would not otherwise have, AtGames asserts the following defenses to the allegations of the First Amended Complaint:

### First Defense:  Unclean Hands and In Pari Delicto

Plaintiff's requested relief is barred or otherwise limited by its unclean hands and/or the doctrine of *in pari delicto*, due to Plaintiff's own misconduct.  Such misconduct includes the fact that this action is part of a pattern of retaliation for AtGames' contract with GCC, and BNEA's pattern of misrepresentations and omissions (including, without limitation, its attempt to induce AtGames into further licensing discussions only to use those ongoing licensing discussions against AtGames in this litigation).

### Second Defense:  Waiver, Acquiescence and Estoppel

Plaintiff have waived, acquiesced and/or should be estopped from obtaining the relief it seeks.  Among other things, Plaintiff led AtGames to believe it had permission to develop and have discussions with retailers concerning a potential Ms. Pac-Man product.  Plaintiff also gave permission to and approved of AtGames' alleged wrongful conduct.

### Third Defense:  Laches

Plaintiff's requested relief is barred under the doctrine of laches due to the unreasonable delay in bringing these claims.

### Fourth Defense:  No Injunctive Relief

Plaintiff is not entitled to any of the injunctive or equitable relief it seeks because it has not suffered an irreparable harm, it has an adequate remedy at law, the balance of hardships weighs against an injunction and/or the public interest would not be served by an injunction.

### Fifth Defense:  Statute of Limitations

Plaintiff's requested relief is barred to the extent it seeks to impose liability or collect damages for actions that occurred outside the statute of limitations period for each cause of action.

### Sixth Defense:  License

Plaintiff's requested relief is barred to the extent it seeks to impose liability or collect damages for actions taken by AtGames pursuant to a license agreement.

### Seventh Defense:  Good Faith and Lack of Willfulness

Plaintiff's requested relief is barred, and at minimum its damages (statutory or otherwise) are limited, because AtGames has at all times acted in good faith and without willfully violating Plaintiff's rights or engaging in unlawful behavior.

### Eighth Defense:  Fair Use

To the extent AtGames has made use of Plaintiff's intellectual property, it has made permissible fair use of such intellectual property.

### Ninth Defense: Harm Caused by Parties Other Than AtGames

Any alleged harm was caused by parties other than AtGames, including BNEA, itself.


WHEREFORE, with respect to Plaintiff's Complaint and the allegations contained therein, AtGames respectfully requests that this Court:

     i.       Enter judgment on AtGames' behalf on each of the counts in Plaintiff's

ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS
Case No. 3:19-cv-05898-VC

       Complaint;

ii.     Enter judgment that Plaintiff take nothing and receive no relief by way of its

       Complaint;

iii.    Dismiss the Complaint with prejudice;

iv.    Award AtGames its costs and attorneys' fees to the greatest extent permissible

       under the law; and

v.     Grant to AtGames such other and further relief as the Court deems fair and

       equitable.

## COUNTERCLAIMS

For its counterclaims against Bandai Namco Entertainment America Inc. ("BNEA" or "Counterdefendant"), counterclaimant AtGames Holdings, Ltd. ("AtGames" or "Counterclaimant") alleges as follows:

1.     AtGames brings these counterclaims because BNEA has breached its contracts with AtGames concerning the Pac-Man video game, including the implied covenant of good faith and fair dealing contained therein, by purporting to terminate those contracts without good cause and as unjust retaliation for AtGames Cloud Holdings Ltd.'s ("AtGames Cloud," an affiliate of AtGames) acquisition of General Computer Corporation ("GCC")'s interest in the Ms. Pac-Man video game.

## PARTIES

2.     AtGames is a corporation formed under the laws of the British Virgin Islands, with a place of business located in Taipei, Taiwan.

3.     Upon information and belief, BNEA is a Delaware corporation with a principle place of business located in Santa Clara, California.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1367.

5.     BNEA is subject to the personal jurisdiction of this Court because it has a principal

place of business within California, because a substantial part of the events or omissions giving rise to these counterclaims occurred within California, by virtue of BNEA asserting the claims in its Complaint in this Court, and by virtue of jurisdiction clauses in the relevant contracts referenced herein.

6.      Venue is proper in this judicial district based on 28 U.S.C. § 1391(b)(1) because BNEA is a resident of this district, 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to these counterclaims occurred within this district, by virtue of BNEA asserting the claims in its Complaint in this Court, by virtue of jurisdiction clauses in the relevant contracts referenced herein and, otherwise, 28 U.S.C. § 1391(b)(2).

## INTRADISTRICT ASSIGNMENT

7.      A substantial part of the events or omissions giving rise to these counterclaims occurred in the County of Santa Clara.  Accordingly, assignment to the San Jose Division is proper pursuant to Civil L.R. 302(c).  Furthermore, assignment to the San Jose Division is proper in view of BNEA having asserted the claims in its Complaint in this Court and by virtue of jurisdiction clauses in the relevant contracts referenced herein.

## FACTUAL BACKGROUND

8.      AtGames is a global player in digital media and information technology with a unique focus on interactive entertainment.  Over the years, AtGames' achievements have spanned retail products, digital distribution, streaming technology, and more.  AtGames has been very successful in bringing back to gamers many beloved classic video games, including those previously released by Atari such as Asteroids, Missile Command, Pong, and Breakout, Activision's Pitfall, River Raid, Kaboom!, Disney's Lion King, Aladdin, Star Wars, Taito's Space Invaders, Konami's Frogger, and BNEA's Pac-Man, Galaga and Dig Dug.  AtGames' gaming products are sold through the nation's largest retailers including Walmart, GameStop, Target, Walgreens, Dollar General, and Bed Bath and Beyond.

9.      As discussed below, AtGames has entered into multiple licensing agreements with BNEA for videogames, including Pac-Man, for use in AtGames' products.  These license

ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS
Case No. 3:19-cv-05898-VC

agreements made AtGames and BNEA significant amounts of money.

## THE 2016 AGREEMENT & ATGAMES' SUCCESSFUL SALE
## OF LICENSED PAC-MAN PRODUCTS

10.     AtGames and BNEA entered into a written License Agreement effective as of October 10, 2016 (the "2016 Agreement"), which is a valid and enforceable agreement. Pursuant to the 2016 Agreement, BNEA granted to AtGames a license to use the characters, designs, likeness, visual representations, copyrights, character names, trademarks and other rights owned or controlled by BNEA and its licensors incorporated in several identified video games, including Pac-Man, for use in the Atari Flashback Portable product.  Ms. Pac-Man was not among the video games that was subject to the 2016 Agreement.

11.     As part of the consideration for the license granted in the 2016 Agreement, AtGames agreed to pay royalties to BNEA with respect to the Atari Flashback Portable product containing Pac-Man, and the 2016 Agreement provided that AtGames would need to pay to BNEA a stipulated amount of minimum guaranteed royalties and in advance payment.

12.     The 2016 Agreement had a term that lasted until March 31, 2020.  Nevertheless, pursuant to Section 16.1, either party was permitted to terminate the 2016 Agreement in the event of a breach that was not cured within thirty days after receipt of written notice of breach from the non-breaching party (except a breach resulting from AtGames' failure to pay royalties or issue royalty statements had a ten day notice period).  Moreover, pursuant to Section 16.3 of the 2016 Agreement, BNEA had the right to terminate the Agreement, without a period for cure, by providing written notice to AtGames if:

> (a)      Licensee [i.e., AtGames] manufactures, sells, distributes, promotes, advertises, uses or otherwise exploits any Licensed Product [i.e., the Atari Flashback Portable product containing Pac-Man] or BNEA Property without having the prior written approval of BNEA;

> (b)      any legal action against Licensee concerning a Licensed Product is commenced or threatened for any cause whatsoever, or any court, governmental authority, or industry standards body finds a defect or alleged defect in any of Licensee's products;

> (c)      Licensee files a petition in bankruptcy, or bankruptcy protection from its creditors under any bankruptcy, restructuring, or

similar law, or such petition or the like has been filed against Licensee, or if Licensee is unable to pay its debts as they become due, or Licensee's financial status has otherwise deteriorated or there is a reasonable reason to believe so;

(d)     Licensee has dissolved, merged, or been merged, or has assigned the important portion of its business or has been split; or

(e)     Licensee breaches any of its obligations under any other agreement with BNEA, and BNEA terminates such agreement.

13.     Consistent with the license granted in the 2016 Agreement, AtGames has successfully developed, marketed and sold an Atari Flashback Portable product containing Pac-Man.  This has proven lucrative for AtGames and BNEA, which has received substantial royalty revenues from AtGames by virtue of the 2016 Agreement.

14.     Indeed, from the inception of the 2016 Agreement until August of 2019, BNEA collected money and raised no complaints about the Atari Flashback Portable product containing Pac-Man.

15.     AtGames fully performed all of its obligations under the 2016 Agreement, and it has paid--and BNEA has accepted--all royalties owed for the Atari Flashback Portable product containing Pac-Man.

16.     AtGames has not engaged in any conduct that justifies termination of the 2016 Agreement pursuant to Section 16.1, 16.3 or any other section thereof.

17.     The 2016 Agreement further provides: "In the event that any action or proceeding is brought in connection with this Agreement, the prevailing party will be entitled to recover its action and reasonable out-of-pocket costs and attorney's fees following a final judgment."

## THE 2018 AGREEMENT & ATGAMES' SUCCESSFUL SALE
## OF LICENSED PAC-MAN PRODUCTS

18.     AtGames and BNEA entered into a written Merchandise Development & Distribution Agreement effective as of June 1, 2018 (the "2018 Agreement"), which is a valid and enforceable agreement (the 2016 Agreement and 2018 Agreement collectively, the "BNEA Agreements").  Pursuant to the 2018 Agreement, BNEA granted to AtGames a license to develop, and upon BNEA's approval distribute, certain interactive entertainment products containing

ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS
Case No. 3:19-cv-05898-VC

copyrights, trademarks, trade secrets, industrial design rights, utility patents, rights to likeness, publicity or privacy and other similar intellectual property rights owned or controlled by BNEA, including with respect to any story line, environment, gameplay, game features, characters, character names and titles, concepts, design elements, "look and feel," artwork, graphics, sound and music, literary, dramatic and any other content or material comprising, featured in, or relating to such interactive entertainment products and any part or element thereof--including any data, materials or content relating to or incorporated in same, including any trademark, trade name, service mark, logo, design, character or artwork owned by BNEA or its licensors, and any part or element thereof.  Pac-Man was among the specific interactive entertainment products to which BNEA granted a license to AtGames under the 2018 Agreement; Ms. Pac-Man was not among those products.  The license applied solely to specified "Licensed Products," which included the "Wireless plug-and play HDMI dongle (with wireless controller) pre-loaded with Licensee-developed versions of all BNEA Properties" (the "HDMI Dongle").

19.     As part of the consideration for the license granted in the 2018 Agreement, AtGames agreed to pay royalties to BNEA with respect to the HDMI Dongle containing Pac-Man, and the 2018 Agreement provided that AtGames would need to pay to BNEA a stipulated advanced guarantee.

20.     With respect to the distribution of the HDMI Dongle, the 2018 Agreement had a term that lasted until May 31, 2022.  Nevertheless, pursuant to Section 7.c.ii, either party was permitted to terminate the 2018 Agreement "for cause" if the other party "is in breach or default of any term or provision of this Agreement … and such breach, default, or failure remains uncured (if capable of a cure) for fourteen (14) days after the breaching Party's receipt of written notice from the non-breaching Party describing such breach, default, or failure in reasonable detail."  In addition, pursuant to Section 7.e, BNEA was permitted to terminate AtGames' license to distribute the HDMI Dongle: "(i) if Licensee [i.e., AtGames] is in breach of this Agreement and such breach is not cured within fifteen (15) days of the receipt of written notice of such breach from BNEA; (ii) immediately upon written notice to Licensee, if Licensee advertises,

sells, or distributes a Licensed Product: (a) outside the Territory or through an Excluded Channel; or (b) that violates Subsection 2.c. [i.e., Quality Control, Testing and Labeling Requirements]."

21.     Consistent with the license granted in the 2018 Agreement, AtGames has successfully developed, marketed and sold an HDMI Dongle containing Pac-Man.  This has proven lucrative for AtGames and BNEA, which has received substantial royalty revenues from AtGames by virtue of the 2018 Agreement.

22.     Indeed, from the inception of the 2018 Agreement until August of 2019, BNEA collected money and raised no complaints about the HDMI Dongle containing Pac-Man.

23.     AtGames fully performed all of its obligations under the 2018 Agreement, and it has paid--and BNEA has accepted--all royalties owed for the HDMI Dongle containing Pac-Man.

24.     AtGames has not engaged in any conduct that justifies termination of the 2018 Agreement pursuant to Section 7.c, 7.e or any other section thereof.

25.     The 2018 Agreement further provides: "In the event that either Party institutes against the other Party any Action arising out of or relating to this Agreement, the prevailing Party in such action will be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by such Party in prosecuting or defending against such Action, including such Party's reasonable attorneys' fees, expenses and court costs incurred therein."

## ATGAMES' ATTEMPTS TO OBTAIN A LICENSE TO MS. PAC-MAN, AND ACQUIRE GCC'S RIGHTS TO MS. PAC-MAN

26.     In contrast with Pac-Man, AtGames has never sold a Ms. Pac-Man home arcade, a Ms. Pac-Man HDMI dongle, or any other home entertainment device with the Ms. Pac-Man video game.

27.     AtGames has, however, desired a license to Ms. Pac-Man from BNEA so that it can make a Ms. Pac-Man home arcade and other home entertainment devices.

28.     Throughout 2018 and 2019, AtGames was in serious and advanced business discussions with BNEA regarding AtGames' development of gaming products with Ms. Pac-Man.  Throughout these business discussions, AtGames was transparent with BNEA as to the

gaming products that AtGames wanted to develop, was transparent that AtGames was talking to retailers, and even sent to BNEA an image of a potential AtGames Ms. Pac-Man product at the retail shelf.  In connection with those discussions, AtGames did not tell anyone at GameStop, Walmart or any other retailer that AtGames had a license to Ms. Pac-Man; rather, the discussions centered around a potential product AtGames might provide in the event it obtained a license to the rights to the Ms. Pac-Man.

29.     Throughout the business discussions, BNEA understood that Walmart and GameStop were interested in AtGames' potential Ms. Pac-Man products and that AtGames was communicating with retailers.

30.     In fact, as part of AtGames' ongoing discussions with BNEA about Ms. Pac-Man, on October 15, 2018, a Shoya Yamazaki of BNEA sent an email to AtGames, in which he said: "**we're ok with releasing Ms. PAC-MAN blast** [i.e., the HDMI Dongle] regarding Home Arcade, we need to discuss with our JP headquarter, and BANDAI NAMCO Amusement America… The reason being, there would be another royalty to 3rd party for Ms. PAC-MAN, and with that, Ms. PAC-MAN cannot be mixed up with our other IPs. (If we mix up Ms. PAC-MAN with other IPs, we have to pay 3rd party royalties for all IPs included)."  (Emphasis added).  This e-mail constituted an approval to proceed with the Ms. Pac-Man HDMI Dongle (referred to as the Ms. Pac-Man blast in his email) --and, at minimum, it certainly was not an objection to AtGames' efforts concerning Ms. Pac-Man.

31.     On October 16, 2018, AtGames sent to BNEA formal written proposals--using BNEA's template--for Ms. Pac-Man products, which included such details as royalty forecasts, distribution channels and a list of retailers.

32.     In the subsequent months, through at least July 30, 2019, AtGames and BNEA remained in contact about formalizing and finalizing the details of an agreement for Ms. Pac-Man.  At no point during this period did BNEA object to AtGames' efforts vis-à-vis Ms. Pac-Man or allege that AtGames had committed any breaches of the BNEA Agreements.

33.     In or around August of 2019, AtGames and AtGames Cloud met with Kevin

Curran, one of several successors-in-interest to GCC (the "GCC Successors"), to better understand the nature of the GCC Successors' interest in Ms. Pac-Man and to discuss potential collaborations.  During that meeting, AtGames and AtGames Cloud learned that the GCC's Successors only had a royalty sharing right in Ms. Pac-Man (*i.e.*, they received certain royalties on Ms. Pac-Man from BNEA), not the right to grant or block any license to Ms. Pac-Man.  Mr. Curran further advised that BNEA had offered to buy the GCC's Successors' rights, but Mr. Curran was unhappy about BNEA's low offer.

34.     Upon information and belief, in or around the Summer of 2019 (and potentially much earlier): (i) BNEA was seeking to purchase the rights in Ms. Pac-Man held by the GCC Successors, (ii) BNEA made very low offers to purchase those rights, and (iii) BNEA was not revealing to the GCC Successors the true revenue potential of Ms. Pac-Man, so as to drive down the price of the GCC Successors' rights.

35.     Upon information and belief, the agreement between BNEA and the GCC Successors was an impediment to AtGames' efforts to obtain a license to Ms. Pac-Man.  .

36.     Accordingly, AtGames sought to resolve these issues and clear up the obstacles to it obtaining a license to Ms. Pac-Man.  Thus, on August 16, 2019, AtGames Cloud and the GCC Successors entered into a licensing support agreement, the effect of which was that AtGames would pay a royalty directly to the GCC Successors on Ms. Pac-Man products so that BNEA would not need to pay any royalties to the GCC Successors on certain products.  In other words, this agreement benefitted BNEA by effectively nullifying its obligation to pay royalties to the GCC Successors on certain products.

37.     On August 24, 2019, AtGames Cloud and the GCC Successors entered into an Assignment & Assumption Agreement, pursuant to which AtGames Cloud obtained the GCC Successors' interest in Ms. Pac-Man.  Upon information and belief, the $10 million purchase price paid by AtGames Cloud was substantially higher than BNEA's low offers.  Thereafter, AtGames Cloud formally notified BNEA of its acquisition of the GCC Successors' rights.

ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS
Case No. 3:19-cv-05898-VC

## BNEA'S BAD FAITH RETALIATION FOR ATGAMES' ACQUISITION OF GCC'S RIGHTS

38.     As discussed above, as recently as July 30, 2019, BNEA was generally supportive of AtGames developing and selling a Ms. Pac-Man product--although there was an obstacle in the form of the GCC Successors' interest in Ms. Pac-Man.  BNEA's position changed completely in August of 2019, when it learned that AtGames and AtGames Cloud were interacting with the GCC Successors, as discussed above.

39.     Upon information and belief, BNEA was upset that AtGames and AtGames Cloud were interacting with the GCC Successors because BNEA hoped to acquire the GCC Successors' interest in Ms. Pac-Man for a relatively low price--and in order to achieve this BNEA was failing to disclose to the GCC Successors information relevant to the value of their interest (such as a true depiction of the revenues that could be generated by Ms. Pac-Man).

40.     Accordingly, BNEA began retaliating against AtGames and AtGames Cloud.

41.     For example, on August 21, 2019, after BNEA learned of AtGames and AtGames Cloud's discussions with the GCC Successors, Mr. Yamazaki of BNEA advised AtGames and AtGames Cloud that BNEA would not license Ms. Pac-Man to AtGames.

42.     On August 22, 2019, during a telephone call, Patrick Lundell of BNEA threatened that, as a direct consequence of AtGames and AtGames Cloud approaching the GCC Successors, if AtGames Cloud did not withdraw its offer to the GCC Successors by the end of the day, BNEA would promptly terminate the BNEA Agreements and remove AtGames from BNEA's list of licensees.

43.     On August 27, 2019, counsel for BNEA wrote the following in an email to counsel for AtGames (emphasis added):

> AtGames has the opportunity to preserve its current relationship and license agreements and potential future opportunities with Bandai Namco, *so long as AtGames complies with Bandai Namco's request, i.e. that AtGames rescinds whatever offer it has proposed to GCC* relative to assignment of the agreement between Bandai Namco and them,... *If that commitment is not forthcoming by close of business today, i.e. by 6:00 pm Pacific today August 27, 2019, BNEA will*

ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS
Case No. 3:19-cv-05898-VC

*immediately terminate its current license agreements with AtGames, and will permanently remove AtGames as a partner with which it conducts business*.

44.     On August 27, 2019, BNEA made good on its threats by sending a notice to terminate the BNEA Agreements (the "Termination Notice").  The primary reason for such termination was an allegation that AtGames had supposedly manufactured, sold, distributed, promoted, advertised, used or otherwise exploited BNEA's intellectual property without its permission, in supposed violation of Section 16.3 of the 2016 Agreement and Section 7.c.ii. of the 2018 Agreement.  However, the Termination Notice made no specific reference to any supposedly improper distribution of the Pac-Man products that were the subject of those Agreements.  Rather, the Termination Notice was referring to allegations that AtGames had supposedly breached the BNEA Agreements by selling and distributing Ms. Pac-Man products.  But, even if that were true (which AtGames denies), it would not constitute a breach of the BNEA Agreements because those Agreements dealt only with Pac-Man and could not be breached if AtGames were distributing a Ms. Pac-Man product.  Accordingly, the primary basis for terminating the BNEA Agreements as set forth the Termination Letter, was baseless.

45.     A secondary alleged breach in the Termination Notice--that AtGames had supposedly breached the BNEA Agreements' confidentiality provisions--was equally meritless, as it failed to identify supporting facts.  In any event, the supposedly confidential information related to Ms. Pac-Man, and therefore could not be a breach of the BNEA Agreements concerning Pac-Man.

46.     On August 28, 2019, counsel for AtGames responded to the Termination Notice by pointing out the above-referenced flaws and asserting that BNEA's purported termination of the BNEA Agreements was invalid.

47.     Indeed, the Termination Notice did not reflect a good faith belief by BNEA that AtGames had breached the BNEA Agreements or that there was a valid basis to terminate the BNEA Agreements.  Rather, they were in retaliation for AtGames Clouds' negotiations with the GCC Successors--as BNEA had promised it would do if those negotiations did not cease.

48.     On September 20, 2019, counsel for BNEA sent a letter to counsel for AtGames (the "September 20 Letter"), in which BNEA asserted brand new theories why AtGames had supposedly breached the BNEA Agreements.  This time, BNEA alleged that AtGames had breached Section 2(c) of the 2018 Agreement by "using Third Party Materials" in developing the relevant Pac-Man product.  Specifically, BNEA alleged, between August 2018 and October 2018--over a year prior--AtGames had supposedly displayed the logo of an unidentified Third Party software development company during the launch sequence of the Game.  Notably, during the August 2018 and October 2018 period, BNEA had not identified such alleged conduct as a breach or raised any objection to AtGames' supposed conduct vis-à-vis the supposed "Third Party Materials."

49.     The September 20 Letter contained another, equally meritless and bad faith allegation of breach:  that, in or around August and September 2018--over a year prior--AtGames had supposedly distributed a version of a Pac-Man product that differed materially from the version approved by BNEA.  In fact, BNEA had approved all products that AtGames had distributed pursuant to the 2018 Agreement and, to the extent BNEA was referring to a discrepancy between the depiction of Pac-Man on the packaging and in the gameplay of certain products, that discrepancy was the result of BNEA's instructions about which images to use on the packaging.  In other words, to the extent there were any issues with the referenced products, those issues only existed because AtGames had accepted BNEA's instructions about the images that should appear on the products' packaging.  Thus, not only had AtGames complied with the 2018 Agreement by obtaining BNEA's approval for the relevant products, but BNEA was now advancing the highly cynical argument that AtGames had breached the agreement by virtue of accepting BNEA's instructions.  This was not a good faith argument being advanced by BNEA.

50.     The supposed breaches identified in the September 20, 2019 letter were not only meritless, but they were manufactured in bad faith by BNEA only after learning of AtGames' Cloud's negotiations with the GCC Successors--and after the allegations in the original Termination Notice were revealed as meritless.

ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS
Case No. 3:19-cv-05898-VC

51.     On September 20, 2019, the same day as the September 20 Letter, BNEA commenced the instant action, in which it asserted claims that AtGames was liable under various theories for supposedly manufacturing and distributing a Ms. Pac-Man Product.  Upon information and belief, that complaint was part of BNEA's retaliation against AtGames and AtGames Cloud for entering an agreement with the GCC Successors.

52.     But BNEA was not done.  On October 4, 2019, counsel for BNEA sent to counsel for AtGames a letter containing yet another new theory why AtGames had supposedly breached the BNEA Agreements.  Now, BNEA was arguing, AtGames had supposedly failed to submit a Pac-Man product to BNEA for approval.  However, that claim was false:  AtGames had submitted the product for approval, BNEA had approved it, *and BNEA had already received royalty payments for the product without objection*.

53.     Accordingly, through the above-referenced conduct, BNEA has, in bad faith, asserted a variety of baseless accusations that AtGames has breached the BNEA Agreements.  Such accusations were not made in good faith, but rather were part of a pattern of retaliating against AtGames because AtGames Cloud was negotiating, and eventually entered, business agreements with the GCC Successors.  AtGames has disputed all such allegations of breach.

54.     As a result of BNEA's bad faith conduct, AtGames has ceased developing, marketing and selling the Pac-Man products.  This has caused substantial harm to AtGames' business.

## COUNT I

## BREACH OF CONTRACT

55.     AtGames repeats the allegations of paragraphs 1-54 of the Counterclaims, as if they were fully set forth herein.

56.     The BNEA Agreements are enforceable contracts.

57.     AtGames has fully performed and/or stands ready to perform the BNEA Agreements.

58.     For the reasons discussed above, BNEA has breached the BNEA Agreements by

repudiating them and terminating them without a valid basis.

59.     BNEA's breach of the BNEA Agreements has caused damage to AtGames in an amount to be determined at trial.  In addition, AtGames is entitled to recover its costs and fees (including attorneys' fees) incurred in connection with these Counterclaims.

## COUNT II

## DECLARATORY JUDGMENT

60.     AtGames repeats the allegations of paragraphs 1-59 of the Counterclaims, as if they were fully set forth herein.

61.     There is an actual, present and justiciable controversy between AtGames and BNEA as to whether BNEA has validly terminated the BNEA Agreements.  As set forth above, BNEA purports to have terminated the BNEA Agreements as a result of alleged breaches by AtGames.  AtGames denies that it has breached the BNEA Agreements and that termination of the BNEA Agreements is permissible.

62.     AtGames seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201 *et seq.*,  that BNEA's purported termination of the BNEA Agreements is null, void and without legal effect.

## COUNT III

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

63.     AtGames repeats the allegations of paragraphs 1- 62 of the Counterclaims, as if they were fully set forth herein.

64.     The BNEA Agreements are enforceable contracts.

65.     AtGames has fully performed and/or stands ready to perform the BNEA Agreements.

66.     For the reasons discussed above, BNEA has breached the implied covenant of good faith and fair dealing the BNEA Agreements by threatening to terminate and/or purporting to terminate the contracts not because of any good faith belief that such termination was justified, but rather as retaliation for AtGames and AtGames Cloud's negotiation with, and eventual agreements with, the GCC Successors.

67.     BNEA's conduct has unfairly interfered with AtGames' right to receive the full benefits of the BNEA Agreements.

68.     BNEA's breach of the BNEA Agreements has caused damage to AtGames in an amount to be determined at trial.  In addition, AtGames is entitled to recover its costs and fees (including attorneys' fees) incurred in connection with these Counterclaims.

### **PRAYER FOR RELIEF**

WHEREFORE, with respect to AtGames' counterclaims and the allegations contained therein, AtGames respectfully requests the Court grant the following relief:

A.     On Counts I and III, monetary damages in an amount to be determined at trial;

B.     On Count II, a declaratory judgment, pursuant to 28 U.S.C. § 2201 *et seq.*, that BNEA's purported termination of the BNEA Agreements is null, void and without legal effect;

C.     An award of AtGames' costs and fees (including attorneys' fees) incurred in connection with these Counterclaims, to the greatest extent permissible under the law; and

D.     Such other and further relief as the Court deems just and equitable.

DATED:  February 19, 2020                    Respectfully submitted,

DENTONS US LLP


By:   */s/ Jennifer D. Bennett*
            Jennifer D. Bennett

Attorneys for Defendant
ATGAMES HOLDINGS, LTD.

ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS
Case No. 3:19-cv-05898-VC

## **CERTIFICATE OF SERVICE**

I hereby certify that on the date indicated below I caused to be served the

**ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS**

via the Court's CM/ECF system upon all counsel of record registered to receive electronic filings as indicated on the Court's website, pursuant to Fed. R. Civ. P. 5(b)(2)(E) and Local Rule 5-1.

I declare under penalty of perjury, under the laws of the United States of America, that the above is true and correct. Executed on February 19, 2020, in San Diego, California.


_____*/s/ Jennifer D. Bennett*_____
Jennifer D. Bennett